BANNER COUNTY, NEBRASKA, APPELLANT, V. STATE BOARD OF
EQUALIZATION AND ASSESSMENT, APPELLEE.

411 N.W.2d 35

Filed August 14, 1987.    No. 86-699.

William E. Peters of Peters & Chunka, P.C., for appellant.

Robert M. Spire, Attorney General, and L. Jay Bartel, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

PER CURIAM.

This case arises out of a controversy concerning the valuation for tax purposes of irrigated cropland in Banner County, Nebraska, for 1986. The county assessor used the 1986

Nebraska Agricultural Land Valuation Manual to establish values of all agricultural land in the county for 1986.

Banner County officials had attended public hearings before the Tax Commissioner's staff regarding the implementation of the 1986 land manual prior to its completion. At those meetings, certain officials from the county testified there appeared to be some problem with some of the calculations. The land manual calculations were ultimately completed, and the manual was used by the assessor to determine values for the 1986 tax year.

Following the receipt of notices by taxpayers in the county, a number of questions were received by the county board of equalization concerning the values placed on irrigated cropland. Hearings were held on April 21 and 28, 1986, to permit all interested persons to provide information concerning the operation of such lands. After the hearings most of the owners of irrigated lands in the county filed formal protests, and a formal hearing was set for May 19, 1986.

Based on the evidence presented at the hearing, the board made several findings.

The board first found that all interested parties had received notices of increased valuations caused by use of the land manual for the 1986 tax year. The board then stated the increase for the value of irrigated lands was substantial and that the board had investigated the increase. The board found the valuations of irrigated lands had been increased by more than 54 percent. The board stated that it had evidence the valuations of dryland in the county compared favorably to counties adjoining Banner County but that values for irrigated land were considerably lower in the adjoining counties.

The board stated there was evidence the irrigated land in the county was very sandy ground and subject to severe erosion. The board further found the assessor had historically adjusted the values of these lands to compensate for the severe erosion and inadequate water supply in the area. The board found that such adjustments by the assessor were no longer possible under the 1986 land manual. The board further found that testimony presented at the hearing confirmed the previous appraisals made by the assessor, that the lands involved were sandy, that

there was severe erosion, and that the land was of lesser value than lands in Cheyenne and Kimball Counties which had received a lower value in the manual. The board stated it had viewed the lands whose valuations were being protested and land on which protests were not filed, had confirmed the testimony presented at the hearings, and concluded adjustments to the land manual valuations were required to determine the true value of the land. The board then asked the assessor to further review the information used by the department and to recalculate the values for such land.

The board stated such recalculations included the addition of information not used by the department, such as the type and condition of the land, and that the resulting values compared favorably with other counties and the information provided by the owners.

On May 29, 1986, the Banner County Board of Equalization adopted a resolution reducing the values of the subclasses of irrigated land in Banner County for the 1986 tax year from the values determined by the 1986 land manual. This adjustment was reported to the State Board of Equalization and Assessment by the State Tax Commissioner on July 10, 1986. The state board then directed the Tax Commissioner to review the action taken by Banner County, as well as by Custer County, Sherman County, and Cherry County, and to report her findings and recommendations on August 11, 1986. Notice to show cause was mailed to Banner County, and a hearing was scheduled for July 29, 1986. Banner County requested a continuance, which was granted, and the hearing was set for August 5, 1986.

At the hearing before the Tax Commissioner the county board contended it had acted properly in decreasing the values of irrigated land. The board contended the figures which the Nebraska Department of Revenue had used were flawed in two aspects: first, because the department improperly used harvested acres rather than total acres to calculate the agricultural land formula and, second, because the department improperly calculated the factor used to ascertain a 5-year average yield as established by the crop reporting service. The county also contended the values established in the 1986 land

manual did not achieve equalization among the counties. Barbara Stoddard, deputy county assessor for the county, testified the recalculation of values was done in the following manner. The formula from the land manual was used to determine the "contribution of value." She then went back to the crop reporting service report and took

> the acres under the crops that were sent out by the state for our use. I have recalculated those and came up with the average yield for Banner County for the last five years. The only change in that that I did make was in the sugarbeet crop, which we did use the yields for the years 1979 through 1984, [because] the 1984 report . . . could not be used because there was still some question as to the price to use . . . .

She also used the actual number of irrigated acres in Banner County as indicated on the 1985 abstract, which was 21,192 acres. She used the same percentage as the state used to determine crop mix. She then calculated the crop yield, which differed from that calculated by the state. That yield was then used in the computation as required by the formula, resulting in a different contribution to value, which lowered the value of irrigated lands from subclass 4A through subclass 2A.

Stoddard testified that she also looked at the values for dry cropland but found that very little change was necessary. Using the yield statistics from the Soil Conservation Service (SCS) reports in calculating the value of dry cropland resulted in a variance of only 1 or 2 percent from the values obtained using the manual, so the averages obtained by the land manual were used to value dry cropland.

Stoddard testified the state had used approximately 16,500 acres in the original manual calculation for the county. Stoddard testified she used the larger number because she believed it was necessary to include all irrigated acres because a crop is raised thereon every year and there is no set-aside on irrigated acres. Stoddard testified the calculations used by the state for dry cropland had accounted for most of those acres in the county and did not require adjustment.

The county assessor testified he had supervised the recalculations. He testified he had applied the land manual as

published in setting the original values and sending notices for 1986. The final adjustments occurred May 29, 1986. A public notice was published following that action to inform the taxpayers, which included the minutes of the board proceedings. It was his understanding the board was acting to correct an apparent problem in the valuations of irrigated land which had been raised by the protests. He further testified that the protests involved about 75 percent or more of the irrigated land in the county, so the county board adjusted the valuations of that land and then, for the purpose of equalizing within the county, adjusted the values of land not specifically within the protests. There was also testimony that Banner County was not on the soil survey at that time but that the classifications of land within the county were reasonable. When asked under what statutory authority the board had proceeded, one official stated he believed it was Neb. Rev. Stat. § 77-1502 (Reissue 1986).

Following the hearing the Tax Commissioner notified the county that the commissioner would recommend the state board restore the values in the county to the values established by the 1986 land manual.

On August 11, 1986, the state board met to consider the recommendations of the Tax Commissioner. At that meeting representatives of Banner County presented testimony regarding the recommendations. At that hearing Jerry Knoche, an appraisal manager in the property tax division of the Department of Revenue, testified the department had used the number of total agricultural acres in Banner County to calculate land values. He testified the factor used by the county as part of the formula to adjust the individual class yields for each crop with a 5-year average was incorrect because the county calculated its own averages rather than using the averages reported by the reporting services. It was his opinion the figures for the department were correct and the values established in the 1986 land manual reflected the actual value of irrigated land in the county. He also testified that 1985 Neb. Laws, L.B. 271, codified at Neb. Rev. Stat. § 77-201 (Supp. 1985) and Neb. Rev. Stat. §§ 77-112, 77-1330, 77-1343 to 77-1348, and 77-1358 to 77-1368 (Reissue 1986), required the use of the same formula to value different types of land and that

the county board had applied two different formulas to value land in the county. Knoche testified a perimeter study of Banner County had been done which illustrated the disparities in classification which occurred because Banner County is not on the soil survey. It was his opinion the same type of land in Banner County was valued differently than land in adjoining counties because the land in Banner County is not correctly classified. He also testified the adjustments made by Banner County created more disparity between that county and adjoining counties.

Knoche testified that prior to the implementation of L.B. 271, a "feathering process" had been used between counties, but that procedure was no longer in use. The state then argued that the formula had not been shown to be arbitrary, capricious, or contrary to law, and was required by law to be used to determine the actual value of agricultural land in the state.

Stoddard reiterated the method she had used to recalculate the figures and stated she had used the total number of acres of irrigated cropland rather than harvested acres. Knoche then testified that harvested acres were used by the department to determine the average by the statistical reporting service and to obtain the different percentages of crops in the crop mix. He also testified that the formula used by the state accounted for all of the acres stated in Banner County's abstract. He then testified that dryland was treated differently; the price had been cut in half to allow for the summer fallow situation. He later testified the statutes require the use of yield average as reported by the crop reporting service, and that office has stated "the only yield they have is on harvested acres."

Tom Gillaspie, an attorney for the Department of Revenue, stated that it was his belief the board made the adjustments pursuant to § 77-1502 and Neb. Rev. Stat. § 77-1504 (Reissue 1986). It was his belief that L.B. 271 "does create actual value in the county and in that instance that 1502 [sic] for the board to determine something other than actual value is beyond their scope." As for § 77-1504, Gillaspie stated that the question is how to determine what values can be compared to assessments to determine whether property is over- or under-assessed. He

stated that § 77-112 now says actual value for agricultural land is to be determined separately and that § 77-201 says actual value equals the results obtained by the use of the formula. He further stated L.B. 271 restricts the ability of county boards to adjust assessments.

The state board found the county board had acted outside the scope of its authority by adjusting only the actual value of irrigated land in the county to achieve equalization within the county and between the surrounding counties. The state board specifically found the use of the statutory formula achieves actual value of agricultural land; therefore, the county's use of different calculations for irrigated land and dryland resulted in inequality between the classes. The state board further found it is the only body empowered to equalize valuations between counties. The state board then ordered the restoration of values established pursuant to the 1986 land manual and declared the adjustments previously made by the county board null and void. This appeal followed.

Banner County's position is that it followed the statutes in adjusting the value of the irrigated cropland and used the methods prescribed and authorized by the statutes. Banner County does not contend that L.B. 271 is unconstitutional and does not seek such a declaration. Banner County seeks only to set aside the action of the State Board of Equalization and Assessment and reinstate the action of its county board of equalization.

The county has set forth six assignments of error. The county contends the state board erred in finding that the county board did not have authority to adjust irrigated land values in the county; in finding that the factors within the statutory formula converting the estimated individual class yields for each crop were properly calculated for the county; in finding that the formula established actual value in the county; in finding that the valuations established pursuant to the land manual equalized values between counties; in finding that the state board was bound by the formula in the land manual in determining equalization between the counties; and in ordering the increase of valuations for 1986.

The state board seeks affirmance of its order, contending

that the county board clearly acted outside the scope of its authority, that the evidence supports the order of the state board and the county has failed to show such action was arbitrary or capricious, and that the state board has a statutorily imposed duty to equalize valuations of all property in the state.

The dispute concerns the adjustment of values of irrigated cropland by Banner County from those set by the application of the 1986 land manual formula. The original land manual values and adjusted values are as follows:

| Irrigated Classification Subclass | Land Manual Value Per Acre | Adjusted Value Per Acre |
|---|---|---|
| 2A | $565 | $425 |
| 3A1 | 490 | 365 |
| 3A | 435 | 325 |
| 4A1 | 355 | 265 |
| 4A | 275 | 205 |

The original values were determined by applying the formula provided by the Nebraska Agricultural Land Valuation Manual, issued in accordance with L.B. 271.

Prior to the passage of L.B. 271, agricultural land was valued by county assessors using manuals provided by the Nebraska Department of Revenue. This practice used earning capacity of the property as the sole criterion for determining land value and resulted in the undervaluation of agricultural land in comparison with other real property. Comment, *Nebraska's "Mysterious" New Tax Valuation System: L.B. 271, the Agricultural Land Valuation Law*, 19 Creighton L. Rev. 623 (1986).

In *Kearney Convention Center v. Board of Equal.*, 216 Neb. 292, 344 N.W.2d 620 (1984), we held that the Nebraska Constitution requires that all tangible property be taxed uniformly and proportionately. We there stated it would be permissible to

reasonably classify property for tax purposes and to use different methods to determine assessed values for different classifications of property. . . . [H]owever, the

results obtained by such permissible different methods must be in some way correlated so that the results reached shall be uniform and proportionate and shall not exceed actual value.

*Kearney Convention Center, supra* at 302, 344 N.W.2d at 625.

The Nebraska Department of Revenue then revised the land manual, which resulted in an increase of approximately 60 percent in the assessed value of agricultural land. 19 Creighton L. Rev. 623, *supra*. The increase was due to the infusion of market value as a part of the formula used to value the land. *Id*.

In 1984 the Legislature proposed an amendment to Neb. Const. art. VIII, § 1. This amendment, commonly referred to as amendment four, was adopted by the voters at the November 6, 1984, election. 19 Creighton L. Rev. 623, *supra*. The proposition on the ballot stated, "A constitutional amendment authorizing the Legislature to separately classify agricultural and horticultural land." L. Res. 7, 88th Leg., 1st Spec. Sess. (1984). The amendment added the following language to art. VIII, § 1: "The Legislature may provide that agricultural land and horticultural land used solely for agricultural or horticultural purposes shall constitute a separate and distinct class of property for purposes of taxation."

Before submitting the amendment four proposal to the voters, the Legislature rejected a proposal to amend the Constitution by repealing the uniformity clause. See L. Res. 1, 88th Leg., 1st Spec. Sess. (1984) (indefinitely postponed in committee). See, also, Note, *Separate Property Tax Classification for Agricultural Land: Cure or Disease?*, 64 Neb. L. Rev. 313 (1985).

Article VIII, § 1, also contains a clause which states that the value of land actively devoted to agricultural use shall be valued with regard to the value such land has for that use. That clause was added by amendment in 1972. 64 Neb. L. Rev. 313, *supra*. Subsequent to this amendment the Legislature added statutory language providing for a "greenbelt" special tax assessment on certain land to relieve urban fringe farmers of the tax burden caused by the speculative land value of the property for development. *Id*.

In 1985 L.B. 271 was enacted to implement amendment four,

and it resulted in several statutory modifications concerning the valuation of agricultural land.

Section 77-201 (Reissue 1981) had provided in part: "All tangible property and real property in this state, not expressly exempt therefrom, shall be subject to taxation, and shall be valued at its actual value."

Section 77-201 (Supp. 1985) provides:

> Except as provided in sections 77-1358 to 77-1368, all tangible property and real property in this state, not expressly exempt therefrom, shall be subject to taxation and shall be valued at its actual value. Such actual value shall be taken and considered as the taxable value on which the levy shall be made.

Section 77-112 now provides:

> (1) Except as provided in subsection (2) of this section, actual value of property for taxation shall mean and include the value of property for taxation that is ascertained by using the following formula where applicable: (a) Earning capacity of the property; (b) relative location; (c) desirability and functional use; (d) reproduction cost less depreciation; (e) comparison with other properties of known or recognized value; (f) market value in the ordinary course of trade; and (g) existing zoning of the property.

> (2) The term actual value when applied to agricultural land . . . for purposes of taxation shall mean that value determined pursuant to sections 77-1358 to 77-1368.

Section 77-1358 states the legislative findings upon which L.B. 271 was premised. The Legislature found amendment four authorized the placement of agricultural and horticultural land into a separate class for the purpose of taxation. § 77-1358(1). The Legislature further found a different valuation system for such land was required for various stated reasons and that such a valuation method should be based on the earning capacity of such land. § 77-1358(2)(e). The earning capacity method "shall be rationally based on accurate crop yields, prices, and patterns, expenses, and rate of return data. The method shall use nominal interest rates and average income data in order to maintain the historical valuation relationship between

agricultural land . . . and all other real property." § 77-1358(3).

Section 77-1359 defines the terms agricultural and horticultural land, and § 77-1360 sets out the qualifications for small tracts which are to be assessed as agricultural lands. Section 77-1361 provides that agricultural and horticultural land, used solely for those purposes

> shall constitute a separate and distinct class of property for purposes of property taxation. For tax year 1986, and each year thereafter, agricultural land and horticultural land shall be valued using the agricultural land valuation manual issued by the Tax Commissioner pursuant to section 77-1330 which shall be developed using the methods prescribed in sections 77-1358 to 77-1368.

Section 77-1330 requires the Tax Commissioner to prepare and annually revise guides to be used by county assessors for all appraisals and reappraisals of property. The section further provides that when, upon review by the Department of Revenue, it becomes apparent that a county has

> failed or neglected to implement any guide prescribed or issued pursuant to subsection (1) of this section, the Tax Commissioner may, after a notice and hearing conducted in accordance with Chapter 84, article 9, order whatever corrective measures the Tax Commissioner deems necessary to secure compliance with subsection (1) of this section.

The wording of this section was not changed by L.B. 271 from its previous language.

Section 77-1362 prescribes the method to be used by the Tax Commissioner to determine the actual value of agricultural land for taxable years beginning in 1986. The method requires

> (a) [d]ividing agricultural land . . . into major use categories and such categories into subclasses based on soil classifications; (b) computing a typical income stream based on historical gross receipts and landowner share determined using the method described in section 77-1364; and (c) dividing the derived income stream by a capitalization rate determined using the method described in section 77-1365.

Subsection (2) of that section provides that the land manual

shall contain allowances to adjust actual values for irrigation costs and land productivity cost variations. Adjustments shall be based on empirical data and apply to areas with uniform characteristics which are within or which cross county lines. Upon written application to and approval from the Tax Commissioner a county assessor may apply such adjustments to specific parcels of agricultural land and horticultural land. No other site specific adjustments shall be made. The provisions of this subsection shall be strictly construed to maintain the concept of statewide mass appraisal of agricultural land and horticultural land.

Section 77-1363 divides agricultural and horticultural land into five categories: irrigated cropland, dryland cropland, pasture, rangeland, and wasteland. Each category is to be divided into subclasses based on soil classification standards, and county assessors are required to utilize and implement soil surveys in the tax year after they become available.

Section 77-1364 states in part: "Income streams for irrigated and dryland cropland shall be computed by multiplying gross receipts by landowner share by county." Gross receipts are to be computed "by multiplying the most recent five-year average price of a crop by the most recent five-year average yield of a crop and weighting the result by the most recent five-year average cropping pattern." Crops included are enumerated in the statute. Such data are to be taken from the Nebraska Crop and Livestock Reporting Service (NCLRS) or other state or federal agencies. Landowner share is defined as the proportion of the gross receipts less landowner expenses paid to the landowner. Methods for determining values for the other categories of property are also set out in this section.

Section 77-1365 sets out the method to be utilized in establishing the capitalization rate. There are two components in the rate: the debt portion and the equity portion, which are based on the relative proportion of real estate debt to farmer equity for the farm sector in the state. The proportions are set at 20 percent debt and 80 percent equity for 1986. After January 1, 1987, those amounts may be adjusted.

The percentage of debt is then multiplied by a number equal

to the most recent 5-year average of the Federal Land Bank interest rates in the Omaha district, resulting in the weighted debt capitalization rate. The number representing owner equity is then to be multiplied by the most recent 5-year average of 6-month U.S. Treasury bill interest rates, resulting in the weighted equity capitalization rate.

The numbers yielded by those computations are then added together to obtain the appropriate capitalization rate.

Section 77-1366 creates the Agricultural Land Valuation Advisory Board. Section 77-1367 sets out the board's duties, which include reviewing the land manual, reviewing data sources, and generally overseeing revisions of the land manual. Section 77-1368 provides that a new manual must be prepared when the actual value of agricultural land in any crop reporting district exceeds 105 percent or is less than 95 percent of the actual value of such land as determined using the most recent land manual.

Banner County first contends the state board erred in finding the county board was without authority to adjust the values of irrigated land to achieve intracounty equalization. The county argues the state board erred in holding that (1) "the use of the uniformly applied formula is deemed to achieve actual value of agricultural land" and that (2) "equalization of these classes has not been achieved because different calculations were used to value irrigated land and dryland."

The county board contends it had the authority to adjust the values because the statutes setting forth the duties and procedures of county boards with regard to the equalization of property values, §§ 77-1502, 77-1504, and Neb. Rev. Stat. § 77-1506.02 (Reissue 1986), were not affected by the enactment of L.B. 271. The county board further contends this power was not affected by § 77-1361, arguing that provision applies only to county assessors. As further support for its position, the county board has pointed out that an opinion of the Attorney General issued on June 12, 1980, stated that the county board was not forbidden to depart from the manuals prepared by the Tax Commissioner or from exercising its normal equalization functions. It further stated: "[W]e would not hold that the County Board . . . was without power to

depart from the manuals unless compelled by unequivocal statutory language, because such a construction would, in our opinion, render the statute constitutionally suspect, as denying property owners due process of law." Op. No. 296, Rep. of the Att'y Gen. of Neb. 427, 428 (1979-1980).

The county further argues the statutes are not inconsistent and that the enactment of L.B. 271 did not repeal them by implication because the new statutes are not repugnant to the old, nor is there a mandated legislative intent to deny the county boards such authority. The county also argues the state board's finding that the use "of the uniformly applied formula is deemed to achieve actual value of agricultural land" means, in essence, the county board was without authority because the answer to questions regarding assessments must always be supplied by the "uniformly applied formula."

The state board contends the county board failed to comply with the notice requirements of § 77-1506.02, and the resolution does not state the adjustments made were considered to be a percentage adjustment. The state board argues that since a county board can exercise only such powers as are expressly granted by statute and that since such statutes are to be strictly construed, the county board acted outside the scope of its statutory authority in making the adjustments. The state further argues the county board's apparent reliance on § 77-1502 is also misplaced because that statute applies only to protests with respect to individual parcels of property, rather than countywide adjustments of entire classes of property. The state board argues the county board can only accomplish such an adjustment through § 77-1506.02.

The state board further argues that the county board's actions were outside the scope of its authority even if it had complied with the statutory requirements for taking action. The state board argues that although characterized as an attempt to achieve intracounty equalization, the county's action was in reality an attempt to equalize values between counties. The state board contends the sole basis presented by the county for its reduction in irrigated cropland values was the perceived disparity between such values in Banner County as compared to surrounding or neighboring counties. The state board contends

there is no evidence indicating the values for such cropland, as determined by the 1986 land manual, resulted in a lack of uniformity or equalization within the county.

The first issue is whether the county board had statutory authority to reduce the assessed values of irrigated cropland within Banner County. The authority and duties of the county board are set forth in Neb. Rev. Stat. §§ 77-1501 to 77-1515 (Reissue 1986). These statutes were not specifically amended or modified by L.B. 271.

At the hearing before the state board, there was evidence that the county had relied on §§ 77-1502 and 77-1504 in taking its action, and no question was raised as to the county's compliance with these sections. Further, there was evidence that the county had met the requirements of both sections. The county board heard the protests pursuant to § 77-1502 and then used the evidence obtained in the protest hearings to equalize values of irrigated land throughout the county.

Section 77-1504 empowers the county board to

equalize the valuation of real property of the county by raising the valuation of such tracts and lots as are assessed too low and lowering the valuation of such tracts and lots as are assessed too high. In cases of evident error of assessment or of apparent gross injustice in overvaluation or undervaluation of real property, it may consider and correct the same by raising, after due notice has been given to the interested party or parties, or by lowering the actual valuation of such real property.

The record shows the county board followed the statutory requirements in decreasing the valuations at issue.

The next issue is whether the county board acted within its authority by considering the values of land in adjoining counties. The record shows that Banner County officials were concerned about some of the calculations to be used in the 1986 land manual prior to its completion. Following the use of the land manual to value property within the county, the board held hearings on the matter in April 1986, formal protests were subsequently filed, and a formal protest hearing held. The board considered evidence presented by landowners concerning the actual value of the land and also considered evidence that

the valuations for irrigated land were considerably lower in adjoining counties. The comparison with other counties was made after the board had recognized there was a problem with the valuations and had independently investigated. The county board adjusted the value of irrigated land within the county to achieve the actual value of such land. Such action is within the authority of the county board. §§ 77-1502 and 77-1504.

Banner County next contends the adjustments it made were appropriate to determine the valuation of irrigated land. The county has 21,192 acres of irrigated cropland. The Department of Revenue, in the 1986 land manual, utilized reported harvested acres, representing 16,584 acres, as the basis of its formula. The department later accounted for the remaining 4,608 acres by assuming the acres were planted to the same crops with the same average yields as the first 16,584 acres, and this assumed yield and crop pattern was then applied against the land manual area estimates of soil productivity grouped into land valuation groups and valued. The county used the SCS estimates of yield with minor adjustments applied to a similar array of cropping practices. The basic difference is that the county used SCS estimates to determine yields while the state used the NCLRS estimated yields.

The county contends its calculations are more accurate because the outcome of the formula will vary greatly depending on the assumptions made regarding cropping patterns. The county further contends its calculations take into consideration the productivity of the soil and are consistent with the values for similar land in adjoining counties.

The state board argues the county has not met its burden of proof to show the action by the state board in setting aside its adjustments was erroneous, arbitrary, or capricious. The state board further argues there is sufficient evidence in the record to sustain its findings and order.

In support of its position the state board argues that L.B. 271 provides the actual value of agricultural land is to be determined by the earning capacity valuation method. The state board contends the department presented evidence this method was rationally and correctly computed in the land manual and correctly determined the value of irrigated land in

Banner County for the 1986 tax year, and therefore, that value represents the actual value of the land. The state board further contends the county's calculations were incorrect.

This is a case of first impression before the court; the first case involving the application of the statutes codifying L.B. 271.

The state Constitution requires that taxes be levied "by valuation uniformly and proportionately upon all tangible property" except motor vehicles. The constitutional amendment upon which L.B. 271 is based, amendment four, permits agricultural property to be treated as a separate class for purposes of property tax. The amendment did not repeal the uniformity clause.

The Constitution, as amended, must be read as a whole. *Dwyer v. Omaha-Douglas Public Building Commission*, 188 Neb. 30, 195 N.W.2d 236 (1972). The power to tax is a sovereign power, and constitutional provisions relating to that power limit that power. The Legislature cannot circumvent an express provision of the Constitution by doing indirectly what it may not do directly. *Nebraska P. P. Dist. v. Hershey School Dist.*, 207 Neb. 412, 299 N.W.2d 514 (1980). In determining the meaning of a constitutional provision, we must look to the plain and clear language contained therein.

When amendment four was submitted to the voters it did not contain a proposal to repeal the uniformity clause. Such a proposal (L. Res. 1) had been introduced, considered, and rejected. Accordingly, the uniformity clause remains in effect unless the amendment necessarily conflicts with it. *Cunningham v. Exon*, 207 Neb. 513, 300 N.W.2d 6 (1980).

Generally, " 'A constitutional amendment becomes an integral part of the instrument and must be so construed. It must be harmonized, if possible, with all other provisions, and effect must be given to every section and clause as well as the whole instrument.' " *Swanson v. State*, 132 Neb. 82, 94, 271 N.W. 264, 271 (1937). In construing a constitutional provision which limits legislative power, when the language of the provision is explicit, the court is bound to find the intent of the Legislature in the words of the provision itself, and not hold that something different from what the words provide was

intended.

Applying those rules in this case, we find amendment four does not conflict with the uniformity clause. Although both relate to the taxation of property, the provisions were not adopted for the same purpose and can be enforced without substantial conflict. The uniformity clause requires that all tangible property be taxed uniformly and proportionately, while amendment four merely permits the Legislature to place agricultural land in a separate class for tax purposes, permitting the valuation of such land by a different method.

In *Kearney Convention Center v. Board of Equal.*, 216 Neb. 292, 302, 344 N.W.2d 620, 625 (1984), we stated:

[I]t is permissible to reasonably classify property for tax purposes and to use different methods to determine assessed values for different classifications of property. To comport with our Constitution's requirement that "[t]axes shall be levied by valuation uniformly and proportionately upon all tangible property," however, the results obtained by such permissible different methods must be in some way correlated so that the results reached shall be uniform and proportionate and shall not exceed actual value.

Since amendment four did not repeal the uniformity clause, expressly or by implication, the two clauses must be read in such a way as to give effect to both clauses. Thus, L.B. 271 must meet the requirements of both clauses to pass the test of constitutionality. Specifically, amendment four permitted the Legislature to classify property as a separate class, but the uniformity clause required the Legislature to treat that class in a uniform manner with other tangible property. This conclusion is supported by *Kearney Convention Center, supra*, wherein we stated that

dry cropland, irrigated cropland, and all real estate, whether improved or not, are all tangible property of the same class for taxation purposes, as defined in our Constitution; and while such properties may be appropriately classified into logical subclassifications and different appropriate methods of determining values of such subclassifications may be utilized, the answers

obtained as to the values of the various subclassifications of property must be correlated so that *all* tangible property shall be assessed uniformly and proportionately. (Emphasis in original.) *Id*. at 303, 344 N.W.2d at 625-26.

Since the uniformity clause was not repealed, the Legislature can divide the class of tangible property into different classifications, but these classifications remain subdivisions of the overall class of "all tangible property," and there must be a correlation between them to show uniformity. Such a correlation is made by evidence that all tangible property has been uniformly assessed.

No evidence of such a correlation is present in the record before us or in the statutes implementing amendment four. In fact, our review of the statutes shows the correlation requirement was entirely disregarded. Section 77-201 now excepts agricultural land from being taxed at its actual value, but requires such taxation of other tangible property and real estate.

Section 77-112(1) defines actual value for tangible property and real estate as the value ascertained by using a formula containing seven different components to be considered as applicable to the property in question. Subsection (2) of that section provides that the actual value of agricultural land is the value obtained by the application of the earnings capacity formula set forth in §§ 77-1358 to 77-1368.

These sections provide for the separate classification and valuation of agricultural property and are consistent with amendment four. Conspicuously absent from these statutes, however, is a requirement that the resulting values obtained for agricultural land be correlated with the values obtained for other real property, as required by the uniformity clause.

These statutes have the effect of permitting the Legislature to do indirectly what it is prevented by the Constitution from doing directly—the taxation of agricultural land in a nonuniform manner from the taxation of other tangible property. This finding is also supported by § 77-1358(3), which states the 1986 land manual valuation method is designed to "maintain the historical valuation relationship between agricultural land . . . and all other real property." The historical

relationship between such properties in this state is the undervaluation of agricultural property as compared to other real property.

Since the uniformity clause which requires property taxes on all tangible property to be uniform has not been repealed, the Constitution cannot be circumvented by statutes which permit the nonuniform taxation of agricultural land. Since the issue is not presented, we do not undertake to determine whether a Nebraska constitutional amendment permitting land which produces income by raising crops to be taxed differently than land which produces income by other means would violate the U.S. Constitution. See *Sioux City Bridge v. Dakota County*, 260 U.S. 441, 43 S. Ct. 190, 67 L. Ed. 340 (1923).

In reversing the order of the county board, the state board found the board had exceeded its authority in adjusting the value of irrigated land because the state board found that use of the land manual formula achieved actual value. This finding is erroneous because it permits agricultural land values to be determined without any requirement that the resulting values be correlated to ensure uniform taxation. The purpose of L.B. 271 appears to have been to preserve the historic undervaluation of agricultural land in comparison to other tangible property, a goal inconsistent with the uniformity clause.

Further, the county presented evidence that the use of the land manual did not result in a determination of the actual value of irrigated land in the county.

There is a presumption that a county board has faithfully performed its duties in making an assessment, which presumption remains until there is competent evidence to the contrary. Once such evidence is presented, the reasonableness of the valuation becomes one of fact based on the evidence, with the burden of showing such valuation unreasonable resting upon the appellant. *Fremont Plaza v. Dodge County Bd. of Equal.*, 225 Neb. 303, 405 N.W.2d 555 (1987). Such a presumption applies as well to action by the state board. See *Carpenter v. State Board of Equalization & Assessment*, 178 Neb. 611, 134 N.W.2d 272 (1965).

The state board's order was contrary to the law because it

relied on statutes which failed to conform to the uniformity clause of the Constitution.

There is an additional issue raised by the parties as to the authority of a county board of equalization to adjust the values of land under the new land manual. The county board contends the boards retain their statutory authority as determined prior to L.B. 271 because such authority was not expressly repealed or repealed by implication. The state contends that L.B. 271 restricts the authority of the county boards and the state board in these matters to a determination of whether the land manual formula has been correctly applied, but has forbidden them from otherwise adjusting the valuation. The state board further contends the county board used a different method to value irrigated land than it had used for dryland, thereby violating the statutory requirement that all agricultural land be valued pursuant to the land manual.

Although there are certain statutes which apply to county assessors, for example, § 77-1362, L.B. 271 did not modify the statutes which empower the county boards and the state board to act. None of the new statutes contain provisions which specifically apply to those boards. Thus, L.B. 271 did not expressly modify the power of such boards to adjust assessments in the manner prescribed by statute.

It also appears that such statutes were not repealed by implication. The mandated intent of the Legislature in enacting L.B. 271 was to protect the agricultural sector from perceived difficulties in the taxation and valuation of such land. § 77-1358. To ensure such a result the Legislature stated such land would be valued on the basis of its earning capacity and "rationally based on accurate crop yields, prices, and patterns, expenses, and rate of return data." § 77-1358(3). This language indicates the necessity for accurate determination of the factors used in the land manual.

The review and adjustment by county boards and the state board of the factors utilized in the calculations made in preparing the land manual are not inconsistent with this intent if such action is taken to ensure actual value is obtained. The statutes providing for such review are not inconsistent with this goal, and accordingly, we find those statutes were not repealed

by implication. See *Sarpy Co. Pub. Emp. Assn. v. County of Sarpy*, 220 Neb. 431, 370 N.W.2d 495 (1985).

The state board's contention that the county board used a different method to value irrigated land than used for valuing dryland is also unpersuasive.

The disparity between the calculations arose out of the method used to determine average yield of each crop for the various subclasses of irrigated land within the county. Banner County took the total abstract irrigated acres for the county, determined the number of acres in each crop, and using the estimated average yields for each subclass as reported by the SCS, determined average yield per acre. The results obtained by this calculation were lower than those obtained by the department, which used the NCLRS average yield to factor the SCS estimated yields. Because the county used the SCS estimated yields without factoring them by the NCLRS average yields, lower yields resulted, which ultimately resulted in a lower valuation of the property.

Banner County argues its recalculation was necessary to obtain the actual value of irrigated land in the county. It contends the statute requires the use of average yields per crop, which are not available; therefore, assumptions must be made, and the assumptions made by the county were correct because the values obtained more nearly approximated actual value than did those obtained by the state board.

The state board contends the county's failure to use the NCLRS 5-year average yield and the properly factored SCS subclass yields is in direct violation of § 77-1364, which requires the use of the NCLRS 5-year average crop yield, and therefore the county's action was invalid as a matter of law.

Section 77-1364 provides as follows:

Gross receipts shall be computed by multiplying the most recent five-year average price of a crop by the most recent five-year average yield of a crop and weighting the result by the most recent five-year average cropping pattern. . . . The *source* of cropping patterns and yields by county and prices by crop reporting district shall be as reported by the Nebraska Crop and Livestock Reporting Service *or as published by other state or federal agencies.*

(Emphasis supplied.)

Banner County used figures obtained from the crop reporting service which were sent to the counties by the state, but calculated yields by using the SCS estimated yields without factoring in the NCLRS 5-year average crop yields. Contrary to the state board's contention, § 77-1364 does not require that average crop yields or average cropping patterns be determined solely on the basis of the NCLRS, but states that source or any other source "published by other state or federal agencies" may be utilized. Therefore, the statute does not appear to require the exclusive use of the NCLRS figures, and the calculations made by the county are not invalid as a matter of law.

Our review of the record reveals the county had evidence that irrigated land in the county was overvalued because the valuations of such land increased by 54 percent after the implementation of the land manual. The board received protests as to the values, investigated, and found the land was assessed at a value higher than its actual value.

The county board then utilized the same statutorily required formula to value both irrigated and dryland cropland, but used the SCS estimates to determine the average yield for irrigated land because the board concluded the averages obtained by using the SCS estimates resulted in more accurate average yields per crop for irrigated land, and determined the amounts obtained for dryland were accurate. This was a relatively minor change which was permitted under § 77-1364, and it did not create disparity between the two classes of real estate in the county. Some evidence of the lack of disparity is the fact that the county received virtually no protests concerning the valuation of dryland.

Banner County argues its values are more accurate for the following reasons. First, maps included in the 1986 land manual illustrate the county has two significant areas of bluffs and escarpments and has areas of valley-sided slopes, while Kimball and Cheyenne Counties have only minor areas of bluffs and escarpments. Map 5 at page 10 of the land manual shows Banner County's and Kimball County's growing seasons are less than 2,400 degree days, with some portions having less than 2,200 degree days, while about half of Cheyenne County

enjoys more than 2,400 degree days overall, with some portions of the county having close to 2,600 degree days. Map 6 at page 11 of the manual shows Banner County receives less than 16 inches of precipitation annually, while Kimball is mostly above and Cheyenne overall above 16 inches. Map 7 at page 12 shows that Banner County has fewer freeze-free days than both counties.

Banner County then argues the figures in land manual area 1 illustrate the disparity in the county's valuations as compared to those of other counties as follows:

| | **Irrigated Land** | | |
| --- | --- | --- | --- |
| **Subclass** | **Banner County** | **Cheyenne County** | **Kimball County** |
| 1A1 | $710 | $520 | $420 |
| 1A | 660 | 485 | 390 |
| 2A1 | 615 | 450 | 360 |
| 2A | 565 | 405 | 325 |
| 3A1 | 490 | 350 | 285 |
| 3A | 435 | 295 | 250 |
| 4A1 | 355 | 240 | 210 |
| 4A | 275 | 185 | 165 |

In fact, the valuations in only three counties in land manual area 1 exceed Banner County's valuation as to subclass 2A1 land: Scotts Bluff County at $670; Dawes County at $635; and Sioux County at $650, while Banner County is $615. Only three counties exceed Banner County's valuation with regard to subclass 4A: Scotts Bluff County at $310, Dawes County at $310, and Sioux County at $385.

Banner County contends the state dismissed this argument at the hearing on the grounds the difference in classification was due to the dissimilarity of the classification between Banner County and its surrounding counties, because Banner County is not on the soil survey. However, Cheyenne County, one of the adjoining counties used for comparison purposes, also was not on the soil survey at that time.

Another problem raised by the department was that Banner County has only five classifications of irrigated cropland rather than the six recommended by the department. Banner County's

witnesses stated that the county had adopted only five classifications because there were fewer than 200 acres that would fall into either a 2A1 or 2D1 (dryland) classification, all of these acres being scattered throughout the county and not irrigated at the time of the conversion in 1979. Consequently, those acres were grouped into the lower dryland subclass. Banner County contends this grouping had no effect on the valuations of irrigated subclasses because it involves only 200 out of approximately 21,000 acres.

Banner County argues the perimeter study illustrates the validity of its position. That study shows that, comparing irrigated land to irrigated land, the values are as follows:

|  | Land Type | Land Manual Valuation | Adjusted Valuation |
| --- | --- | --- | --- |
| Banner County | 3A | $435 | $325 |
| Kimball County | 3A | 250 | —— |

The county argues that this is a comparison of values involving adjoining acres and that the perimeter study shows Banner County land is valued at a higher level of value than is Kimball County land along their mutual border.

The county further argues the average irrigated values presented by the department for Banner, Kimball, and Cheyenne Counties are very close to those developed by the county board.

The state board vigorously contends Banner County is incorrect. The state first contends it achieved the equalization of values because the same method of valuation was used in every county.

The state next contends the county improperly relied on the maps contained in the land manual because the maps are not detailed enough and reflect a 30-year trend, rather than the most recent 5 years as required by statute. The state also contends Banner County's comparison with other counties concerning subclass 2A1 land is irrelevant because it has no acres in that classification.

The state contends that due to the fact that Banner County's soil classification system is not the same as the other counties', the proper comparison to be made is to compare average

irrigated values and average irrigated crop yields from the counties being compared as follows:

|  |  | Average Irrigated Crop Yields Per Acre | | | |
|---|---|---|---|---|---|
| County | Average Irrigated Land Values | Alfalfa (tons) | Corn (bu.) | Dry Beans (lbs.) | Sugar Beets (tons) |
| Banner | 380 | 4.36 | 113.80 | 1,822.20 | 22.17 |
| Kimball | 320 | 3.96 | 103.80 | 1,502.80 | —— |
| Cheyenne | 350 | 4.24 | 117.80 | 1,651.20 | 20.29 |
| Morrill | 475 | 4.22 | 124.00 | 1,910.00 | 21.33 |
| Scotts Bluff | 610 | 4.44 | 126.20 | 1,950.00 | 22.59 |

The average value figures were taken from the map showing average irrigated values across the state, and the average yields are the NCLRS 5-year average crop yields taken from maps within the land manual.

The state argues this chart illustrates Banner County's land is reasonably valued. For example, all of Kimball County's crop yields are lower than Banner County's, and Cheyenne County's yields are lower in three of four crops, just as Banner County's are lower than Scotts Bluff County's. The state then argues that there are 200 acres known to be misclassified in Banner County, and possibly more. The evidence is, however, that only 200 acres were misclassified. The state also argues that since Banner County has only five subclasses of irrigated land, more value will be attributed to those subclasses. This argument can be illustrated as follows:

| County | No. Subclasses | Land Manual Average Value Per Acre | Subclass Compared |
|---|---|---|---|
| Banner | 5 | $380 | 4A1 |
| Cheyenne | 6 | 350 | 3A1 |
| Kimball | 8 | 320 | 2A1 |

Based on this information, the state board argues in its brief that by using the land valuation by class chart and comparing Banner County's 4A1 (45 percent of all irrigated land in the county) value with Cheyenne County's value for 3A1 (45

percent of all irrigated land in the county) and Kimball County's value for 2A1 (28 percent of all irrigated land in the county) there was no equalization problem.

The state also contends the use of the perimeter study was improper because Banner County was not on a modern soil survey, while Kimball County was.

In reviewing the record, the following facts are apparent. First, the valuations at issue in this appeal pertain to subclasses 2A, 3A1, 3A, 4A1, and 4A. Banner County's valuations for those subclasses are higher than Kimball and Cheyenne Counties', as is illustrated in the chart detailing irrigated land subclass values above. The state argues a more accurate comparison of the three counties requires the comparison of the average values of irrigated acres, as illustrated in the chart above. The chart shows Banner County is valued at $380, Kimball County at $320, and Cheyenne County at $350. These figures illustrate Banner County's average irrigated land value is approximately 16 percent higher than Kimball County's and 8 percent higher than Cheyenne County's. The state further argues that a comparison of 2A1 land in Kimball County, 3A1 land in Cheyenne County, and 4A1 land in Banner County shows values of $360, $350, and $355, which are very similar values. This argument is not persuasive because those values account for only 28 percent of irrigated land in Kimball County, but 45 percent of such land in Cheyenne and Banner Counties.

Further, it is not a comparison of similar classifications of land because neither Banner nor Cheyenne County was on a modern soil survey at this time, while Kimball County was. The state had argued previously that the county was precluded from using such comparisons for that very reason.

Perhaps the best evidence of the actual value of the land was the perimeter study. It shows there is a disparity in the valuation of adjoining land between Banner and Kimball Counties for subclass 3A land in that Banner County was valued at $435 according to the land manual, while Kimball County was valued at $250. Banner County's value was still higher after the county board's adjustment, at $325. This evidence was properly introduced to show the valuation of adjoining lands in the two counties. The state's argument that the use of this study was improper because Banner County was not on the modern soil

survey is unpersuasive because there was evidence the adjoining land was of the same type; therefore, the valuations should have been similar, even though classified differently, because the law requires the uniform valuation of similar property.

We conclude the state board's action negating the action of the county board was contrary to law. The evidence presented by Banner County showed the value of irrigated land had been set by the land manual at an amount higher than its actual value and that the adjustments made by the county board correctly established the land's actual value.

The order of the State Board of Equalization and Assessment is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.