EDWARD JAKSHA, PLAINTIFF, V. STATE OF NEBRASKA ET AL.,
DEFENDANTS.
486 N.W.2d 858

Filed July 24, 1992.　No. S-91-1111.

David A. Domina and Denise E. Frost, of Domina & Copple, P.C., for plaintiff.

Don Stenberg, Attorney General, and L. Jay Bartel for defendants.

BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ., and COLWELL, D.J., Retired.

PER CURIAM.

The plaintiff, Edward Jaksha, a Nebraska resident and owner of taxable personal and real property in the state, seeks a declaratory judgment as to the constitutionality of 1991 Neb. Laws, L.B. 829, which the Legislature passed with an emergency clause, and the Governor signed into law on June 10, 1991. He brings this action against the State of Nebraska, Governor E. Benjamin Nelson, State Treasurer Dawn Rockey, Tax Commissioner M. Berri Balka, and Attorney General Donald Stenberg (State). In his petition and briefs the plaintiff asserts several grounds in support of his claim that L.B. 829 is unconstitutional.

## I. SECTION 7

The plaintiff argues that § 7 of L.B. 829 violates the uniformity and special legislation clauses of the Nebraska Constitution, Neb. Const. art. VIII, § 1, and art. III, § 18, as well as the Equal Protection Clause of the federal Constitution, U.S. Const. amend. XIV. In order to address these arguments it is necessary to separately discuss § 7 as it relates to the 1991 tax year and as it relates to subsequent tax years.

### 1. 1991 TAX YEAR

For tax year 1991 only, § 7 of L.B. 829 exempts from the

property tax rolls all personal property except motor vehicles registered for use on the state's highways. 1991 Neb. Laws, L.B. 829, § 7 (codified at Neb. Rev. Stat. § 77-202(12) (Supp. 1991)). The plaintiff argues that by exempting virtually all personal property from taxation, yet retaining the tax on real property, L.B. 829 violates the mandate of article VIII, § 1, that real and personal property be equalized and taxed uniformly. See *Grainger Brothers Co. v. Board of Equalization*, 180 Neb. 571, 144 N.W.2d 161 (1966) (real and personal property are in the same class for purposes of the uniformity clause). Though recognizing that a 1970 amendment to the state Constitution authorizes the Legislature to classify and exempt any or all personal property from taxation "in such manner as it sees fit," Neb. Const. art. VIII, § 2, the plaintiff insists that we "struck" this provision in *MAPCO Ammonia Pipeline v. State Bd. of Equal.*, 238 Neb. 565, 471 N.W.2d 734 (1991). The State responds by arguing that *MAPCO Ammonia Pipeline* is inapplicable to this case and that the 1991 exemptions are expressly authorized by article VIII, § 2.

In resolving this dispute, we note that on May 12, 1992, the people of this state voted to amend the uniformity clause of article VIII, § 1, to grant the Legislature greater authority to administer the property tax in a nonuniform manner. However, " '[a]n act of the legislature that is forbidden by the Constitution at the time of its passage is absolutely null and void, and is not validated by a subsequent amendment to the Constitution authorizing it to pass such an act.' " *State ex rel. Rogers v. Swanson*, 192 Neb. 125, 128, 219 N.W.2d 726, 729 (1974). We therefore review L.B. 829 under the Constitution as it existed on June 11, 1991.

A state constitution is the supreme written will of the people of a state regarding the framework for their government and is subject only to the limitations found in the federal Constitution. *Ramsey v. County of Gage*, 153 Neb. 24, 43 N.W.2d 593 (1950). The state Constitution, as amended, must be read as a whole. *Dwyer v. Omaha-Douglas Public Building Commission*, 188 Neb. 30, 195 N.W.2d 236 (1972). A constitutional amendment becomes an integral part of the instrument and must be construed and harmonized, if possible, with all other

provisions so as to give effect to every section and clause as well as to the whole instrument. *Swanson v. State*, 132 Neb. 82, 271 N.W. 264 (1937). If inconsistent, a constitutional amendment prevails over a provision in the original instrument; but a court will find distinct constitutional provisions repugnant to each other only when they relate to the same subject, are adopted for the same purpose, and are incapable of enforcement without substantial conflict. *Id.*

With these principles in mind, we begin by briefly reviewing the constitutional history surrounding the uniformity and classification clauses at issue.

### (a) The Uniformity Clause

Prior to the Constitutional Convention of 1919-1920, tangible and intangible property were classified together and taxed at the same rate. See *International Harvester Co. v. County of Douglas*, 146 Neb. 555, 20 N.W.2d 620 (1945). Taxation at the same rate as tangible property worked a hardship on owners of such intangibles as bank accounts and notes, however, because the tax often amounted to more than 50 percent of the interest earned in 1 year. 1 Proc. Const. Convention 629 (1919-1920). As a result, such property was often left off the tax rolls. *Id.* at 630. In an effort to reestablish the tax on intangibles as a viable revenue source, the framers of the current Constitution included a provision authorizing the Legislature to separately classify intangible property and tax it at a lower rate. *Id.*

Some at the Constitutional Convention of 1919-1920 supported a provision authorizing the subclassification of tangible property as well. 2 Proc. Const. Convention at 2364, 2367. Others, however, strongly opposed granting the Legislature such authority, fearing constant attempts by various groups to achieve exemptions for their property and thereby "unload the taxation of property onto the other class." *Id.* at 2366, 2371. The uniformity clause was inserted to quell these concerns and give effect to the underlying principle that "the only equitable system for taxation is one that bears equally upon all the citizens of the state in proportion to the property they hold or in proportion to their ability to pay." 1 Proc.

Const. Convention at 626.

The principal concern of the framers in inserting the uniformity clause was to prevent a plethora of special-interest-driven exemptions from the tax on tangible property. 2 Proc. Const. Convention at 2371. The uniformity clause is therefore similar to the special legislation provision of article III, § 18, in that both abhor the dispensing of "special favors" by legislative bodies. See *Haman v. Marsh*, 237 Neb. 699, 709, 467 N.W.2d 836, 845 (1991). For this reason, principles of equal protection form much of this court's uniformity clause jurisprudence. In the context of taxes, however, the concern with granting "special favors" takes on added significance because the grant of exemptions to one group necessarily entails raising the taxes of another disfavored group. *Equitable Life v. Lincoln Cty. Bd. of Equal.*, 229 Neb. 60, 62, 425 N.W.2d 320, 322 (1988) ("governmental costs not shared by one group of taxpayers must necessarily be shifted to and be borne by the remaining taxpayers"). See, also, 1 Proc. Const. Convention at 310 (William Jennings Bryan stated, "If you will take from one man ten dollars when you should only take five, and then take from some other man only five when you should take ten . . . you simply take five dollars from one man's pocket and put it into another man's pocket"). Thus, while the equal protection clause speaks primarily in terms of the *justification* for a legislative classification, the uniformity clause focuses on the *effect* of such classifications on the remaining tax base.

We note that recently the U.S. Supreme Court upheld, against a federal equal protection challenge, California's system of assessing real property at its "acquisition value," despite the fact that the system creates tremendous disparities in the property taxes levied upon owners of similar property. *Nordlinger v. Hahn*, 60 U.S.L.W. 4563 (U.S. June 18, 1992) (No. 90-1912). However, in so doing, the Court expressly reaffirmed its prior decision in *Allegheny Pittsburgh Coal v. Webster County*, 488 U.S. 336, 109 S. Ct. 633, 102 L. Ed. 2d 688 (1989), holding that the practice of assessing recently purchased property on the basis of its purchase price while making only minor modifications in the assessments of

property not recently sold did violate the 14th Amendment. Thus, the precise contours of the federal Equal Protection Clause in the context of state taxation are far from clear.

It is also important to point out that the guarantees contained in the federal Constitution represent only a floor below which the states may not fall in protecting individual rights. They in no way preclude a holding that a similar provision in a state's constitution affords its citizens even greater protections than they enjoy at the national level. See Jerome B. Falk, Jr., *The State Constitution: A More Than "Adequate" Nonfederal Ground*, 61 Calif. L. Rev. 273 (1973). Indeed, this court recently held that the extremely deferential "rational basis" test—the same test applied in *Nordlinger*—does not apply to a challenge based upon the special legislation provision of article III, § 18. See *Haman v. Marsh, supra*. Moreover, as discussed previously, the uniformity clause of article VIII, § 1, reflects values independent of those protected by the federal Constitution. Thus, the decision in *Nordlinger, supra*, in no way affects our analysis of the state constitutional issues presented in this case.

This court had the opportunity to address the implications of the uniformity clause in *Banner County v. State Bd. of Equal.*, 226 Neb. 236, 411 N.W.2d 35 (1987). That case grew out of a 1984 amendment to the state Constitution authorizing the Legislature to separately classify agricultural and horticultural land. See Neb. Const. art. VIII, § 1. Subsequently to passage of the amendment, the Legislature passed 1985 Neb. Laws, L.B. 271, which included provisions requiring the valuation of agricultural land according to a formula prescribed in a land valuation manual issued by the Tax Commissioner.

The county assessor for Banner County used the land manual to establish values for all agricultural land in the county for tax year 1986. Problems developed when the county board of equalization discovered that the valuations for irrigated lands in the county increased substantially from the previous year and were higher than the valuations of irrigated lands in adjoining counties. Moreover, the county board found that the Banner County lands were in fact worth less than lands in neighboring counties because of their sandy soil and

susceptibility to severe erosion. Noting that in past years the valuations of irrigated lands in the county were adjusted to reflect these deficiencies, the county board again reduced the valuations of irrigated lands in Banner County for 1986 from those determined by the land manual. Upon review of the county board's action, the State Board of Equalization and Assessment found that the county board acted outside its authority in deviating from the valuations prescribed in the land manual and ordered restoration of the original valuations. The county appealed.

On appeal this court reversed the state board's decision. The court emphasized the fact that in passing the resolution to amend the state Constitution, the Legislature left intact the uniformity clause. Thus, the court concluded, "L.B. 271 must meet the requirements of both clauses to pass the test of constitutionality." *Banner County*, 226 Neb. at 253, 411 N.W.2d at 46. The court went on to hold that the provisions requiring valuation of agricultural land according to the land manual's formula did not conform to the uniformity clause because their purpose was to "preserve the historic undervaluation of agricultural land in comparison to other tangible property." *Id.* at 255, 411 N.W.2d at 47.

### (b) The 1970 Amendment and *Stahmer*

In 1967, the Legislature for the first time enacted a state sales tax and an income tax. 1967 Neb. Laws, ch. 487, p. 1533 (codified as amended at Neb. Rev. Stat. § 77-2701 et seq. (Reissue 1990 & Supp. 1991)). Thereafter, concerns arose that certain groups were shouldering a disproportionate share of the tax burden. One such group was farmers, who were forced to pay both sales and property taxes on large amounts of equipment, livestock, and inventory, as well as on their extensive landholdings. Revenue Committee Hearing, L.B. 290, 80th Leg. 2 (April 16, 1969). Certain businesses with large inventories of merchandise and slow turnover rates, such as automobile and lumber dealers, also complained that they were being taxed unfairly in comparison to service-oriented enterprises. *Id.* at 2-5. In response to this problem the Legislature submitted, and the people adopted, a constitutional

amendment authorizing the Legislature to separately classify and exempt personal property for purposes of taxation. See Neb. Const. art. VIII, § 2.

Pursuant to the authority granted in article VIII, § 2, the Legislature in 1972 partially exempted several categories of property from the personal property tax. These categories included most agricultural income-producing machinery and equipment; livestock; grain, fertilizer, seed, and other farm inventories; business inventories; and poultry, fish, honeybees, and fur-bearing animals. 1972 Neb. Laws, L.B. 1241, § 1 (codified as amended at § 77-202(6) through (9)). The bill further directed the State Treasurer to reimburse the county taxing authorities for any revenues lost due to the exemptions, the money to come from funds generated by the sales tax and the income tax. 1972 Neb. Laws, L.B. 1241, § 6.

This court upheld the 1972 exemptions against a constitutional challenge in *Stahmer v. State*, 192 Neb. 63, 218 N.W.2d 893 (1974), *overruled, MAPCO Ammonia Pipeline v. State Bd. of Equal.*, 238 Neb. 565, 471 N.W.2d 734 (1991). In so doing, the court relied heavily on the authority granted in article VIII, § 2, as a specific exception to the general requirement of uniformity contained in article VIII, § 1. Nonetheless, the court recognized the possibility that legislative exemptions from personal property taxation remain subject to a standard of "reasonableness" emanating from the uniformity clause and the special legislation provision of article III, § 18, the state's "equal protection" clause. *Stahmer*, 192 Neb. at 67, 218 N.W.2d at 896. Assuming such a limitation existed, the court concluded that the exemptions were a reasonable attempt to alleviate the heavy tax burden placed upon farmers and businesses with large inventories.

*Stahmer* represents the court's first attempt to balance the authority granted in article VIII, § 2, with the requirement of uniformity contained in article VIII, § 1. In analyzing the decision, it is important to note that the 1972 exemptions did *not* affect the property tax burden of the remaining owners of real or nonexempt personal property because the exemptions were "fully funded" with moneys from the sales tax and the income tax. See Revenue Committee Hearing, L.B. 299 and

829, 92d Leg., 1st Sess. 3 (March 20, 1991). In the absence of any increase in the property tax burden of the remaining taxpayers, the chief evil targeted by the framers of the uniformity clause, the only issue remaining for the *Stahmer* court was the reasonableness of the classifications drawn.

The approach taken in *Stahmer* is very similar to that exhibited in *Banner County*. In *Banner County*, the court recognized that a statutorily prescribed method of assessment resulting in lower valuations of agricultural lands cannot conform to the requirements of the uniformity clause. A systematic undervaluation of agricultural land necessarily involves a reduction in the property taxes levied upon owners of such property. Because the level of funding necessary to sustain local government remains constant, such a reduction also necessarily entails a shift of the property tax burden to the remaining tax base. Thus, despite express constitutional authority to separately classify agricultural land, the *Banner County* court struck down 1985 Neb. Laws, L.B. 271, to prevent the Legislature from doing "indirectly what it is prevented by the Constitution from doing directly—[taxing] agricultural land in a nonuniform manner from the taxation of other tangible property." *Banner County*, 226 Neb. at 254, 411 N.W.2d at 46. Significantly, the court noted that had the uniformity clause been repealed, the only limitation on the Legislature's scheme would be the reasonableness of the classifications under the Equal Protection Clause of the federal Constitution.

Just as the Legislature left the uniformity clause intact in submitting the amendment at issue in *Banner County*, it did so in submitting the 1970 amendment to article VIII, § 2, as well. For that reason we cannot agree with the State's contention that the "classification clause" of article VIII, § 2, is an "express exception to the requirement of uniformity in Article VIII, § 1." Brief for defendants at 30. Instead, in exercising its power to exempt, the Legislature must adhere to the dictates of both clauses. *Banner County* and *Stahmer* indicate that in determining whether exemptions enacted pursuant to article VIII, § 2, are valid, this court must consider (1) whether the exemptions improperly shift the property tax burden to the

remaining tax base, and (2) whether there is a substantial difference of situation or circumstance justifying differing legislation for the objects classified.

### (c) Erosion of the Property Tax Base

In 1977, the Legislature amended the property tax statutes. The amended provisions called for the complete exemption by 1980 of the categories of property partially exempted in 1972. 1977 Neb. Laws, L.B. 518, §§ 2, 4, and 6. More importantly, the amendments placed a ceiling on the amount of money available to counties for reimbursement of revenues lost due to the exemptions. The Legislature set this ceiling amount at $58.6 million, $62.2 million, and $70 million for the 1978, 1979, and 1980 tax years respectively. 1977 Neb. Laws, L.B. 518, §§ 3, 5, and 7. After 1980, the Legislature discontinued the policy of using moneys collected from the sales tax and the income tax to reimburse counties for revenues lost due to exemptions from the personal property tax. 1980 Neb. Laws, L.B. 882, § 9.

The Legislature's decision to place a cap on, and then to completely eliminate, the availability of sales and income tax revenues as replacement funds for moneys lost due to the exemptions changed significantly the nature of the property tax distribution. Because the level of funding necessary for the State's local subdivisions continued to increase after 1980, owners of real property and nonexempt personal property inherited the burden of not only replacing revenues lost due to the exemptions, but of paying for a proportionate share of this increased funding as well. Revenue Committee Hearing, L.B. 299 and 829, 92d Leg., 1st Sess. 3 (March 20, 1991).

A combination of events resulted in the plight of property owners becoming even more grim during the remainder of the decade. The Legislature further reduced the property tax base by granting exemptions for certain earthmoving equipment, see 1980 Neb. Laws, L.B. 882, § 7 (codified as amended at Neb. Rev. Stat. § 77-202.46 (Reissue 1988)), and for jet airplanes, mainframe computers, and agricultural processing equipment used by businesses qualifying for incentives under Nebraska's Employment and Investment Growth Act. See 1987 Neb. Laws, L.B. 775, § 5 (codified at Neb. Rev. Stat. § 77-202(10) (Supp.

1991)). The situation was exacerbated as the courts were called upon to protect the rights of those adversely affected by the Legislature's catalog of exemptions.

In *Trailer Train Co. v. Leuenberger*, 885 F.2d 415 (8th Cir. 1988), *cert. denied* 490 U.S. 1066, 109 S. Ct. 2065, 104 L. Ed. 2d 630 (1989), the U.S. Court of Appeals for the Eighth Circuit upheld a lower court decision enjoining the Nebraska Tax Commissioner from collecting a personal property tax on the plaintiff's railcars. The court based its decision on a finding that Nebraska's system of exempting 75.75 percent of the state's commercial and industrial personal property discriminated against railroads in violation of section 306(1)(d) of the Railroad Revitalization and Regulatory Reform Act of 1976, Pub. L. 94-210, 90 Stat. 31, 54 (codified as amended at 49 U.S.C. § 11503(b)(4) (1988)) (the 4-R Act).

Following the decision in *Trailer Train Co.*, owners of centrally assessed gas and hydrocarbon pipeline systems began seeking declarations that their pipelines were personal property and that they were entitled to "equalization" of the assessed value of those pipelines with the personal property of the railroads. In *Northern Natural Gas Co. v. State Bd. of Equal.*, 232 Neb. 806, 443 N.W.2d 249 (1989), *cert. denied* 493 U.S. 1078, 110 S. Ct. 1130, 107 L. Ed. 2d 1036 (1990), this court held that the plaintiffs were entitled to such relief. The court noted that the proper remedy when the board or the Legislature arbitrarily undervalues a particular class of property, thereby valuing another class of property at a disproportionately higher rate, is to lower the latter's valuation to such an extent as to equalize it with the former. *Northern Natural Gas Co., supra*, citing *Kearney Convention Center v. Board of Equal.*, 216 Neb. 292, 344 N.W.2d 620 (1984) (where use of different methods to determine the assessed value of different classes of property results in systematic undervaluation of one class, owners of property taxed at actual value are entitled to a proportionate reduction). Thus, the court reasoned, "no logical reason exists why the same requirement of valuation reduction should not be imposed when the disproportionality is brought about by a final judgment of the federal court exempting the personal property of the railroads and car companies from the

imposition of a state tax." *Northern Natural Gas Co.*, 232 Neb. at 815, 443 N.W.2d at 256.

*Natural Gas Pipeline Co. v. State Bd. of Equal.*, 237 Neb. 357, 466 N.W.2d 461 (1991), involved another suit by owners of centrally assessed gas transmission pipelines seeking equalization of their personal property with that of the railroads and carline companies, this time for the 1988 and 1989 tax years. The board of equalization denied the requests, and the plaintiffs appealed. Subsequently to perfection of the appeals, the Legislature passed two bills which the State claimed mooted the case. One modified the definition of "real property" to include "pipelines." 1989 Neb. Laws (1st Spec. Sess.), L.B. 1, § 1. The other expressly exempted railroad rolling stock from personal property taxation, pursuant to the authority granted in article VIII, § 2. 1989 Neb. Laws (1st Spec. Sess.), L.B. 7, § 1. Despite the "unusual" procedure posture of the case, the court proceeded to address the effect of L.B. 1 and L.B. 7 as if they were in existence and relied upon by the board at the time of its decision.

The court first rejected the State's claim that L.B. 1 supported the board's decision, holding that application of the statute to the 1989 tax year would result in an impermissible commutation of a tax and in any event was irrelevant to the matter of equalization. Turning to L.B. 7, the court struck down the exemption of railroad rolling stock as unconstitutional. Drawing upon principles of equal protection, the court stated:

> "The rule is well established that the legislature may, for the purpose of legislating, classify persons, places, objects or subjects, but such classification must rest upon some difference in situation or circumstance which, in reason, calls for distinctive legislation for the class. The class must have a substantial quality or attribute which requires legislation appropriate or necessary for those in the class which would be inappropriate or unnecessary for those without the class."

*Natural Gas Pipeline Co.*, 237 Neb. at 370, 466 N.W.2d at 470, quoting *State, ex rel. Cone v. Bauman*, 120 Neb. 77, 231 N.W. 693 (1930). Based upon this standard, the court found no real

distinction between railroads and other common carriers which would justify exemption of the former's personal property but not that of the latter. The court therefore declared the statute violative of both the special legislation provision of article III, § 18, and the uniformity clause of article VIII, § 1, and reversed and remanded the cause for imposition of the requested remedy.

Though the court in *Natural Gas Pipeline Co.* expressly relied upon the arbitrary nature of the classification drawn in striking down L.B. 7, implicit in the decision are concerns with the shrinking property tax base. Prior to the first set of exemptions in 1972, real property accounted for 78 percent of the tangible property subject to taxation, and income-producing personal property the remaining 22 percent. Revenue Committee Hearing, L.B. 299 and 829, 92d Leg., 1st Sess. 3 (March 20, 1991). By 1991, additional legislative exemptions and judicial rulings combined to reduce the percentage of the property tax base consisting of nonexempt personal property to 8 percent, while real property increased to 92 percent of the tax base. *Id.* at 5. These figures indicate that, with the Legislature's refusal since 1980 to reimburse counties for revenues lost due to additional exemptions, the property tax burden between 1972 and 1991 "shifted very heavily towards the people remaining on the tax roll . . . ." *Id.*

Unlike the situation in *Stahmer*, where the exemptions *did not affect* the property tax burden of the remaining tax base, each additional "exemption" occurring during the 1980's resulted in a proportionate increase in the tax burden of the remaining property owners. This shifting of the tax burden raised constitutional problems with regard to owners of both types of property still on the tax rolls, real property and nonexempt income-producing personal property. The shifting of virtually the entire burden for funding the State's political subdivisions to owners of these categories of property implicated the chief evil associated by the framers of the uniformity clause with the power to grant exemptions.

In a concurring opinion in *Natural Gas Pipeline Co.*, two judges recognized these concerns. They warned that the Legislature's perpetuation of an increasingly discriminatory

system of exemptions threatened "the entire property tax base for school districts and other local units of government . . . ." *Natural Gas Pipeline Co.*, 237 Neb. at 373, 466 N.W.2d at 471 (White and Fahrnbruch, JJ., concurring). The judges reasoned:

> When property, regardless of whether it is real or tangible personal property, is classified so that it provides exemption from taxation to all but a small amount of property, the classification and exemption may well be unreasonable and arbitrary and may fall within the prohibition of Neb. Const. art. III, § 18, which is this state's "equal protection clause."

*Id.* at 375, 466 N.W.2d at 472.

### (d) The *MAPCO Ammonia Pipeline* Decision

*MAPCO Ammonia Pipeline v. State Bd. of Equal.*, 238 Neb. 565, 471 N.W.2d 734 (1991), involved a request by several pipeline companies for equalization of their personal property with that of the railroads and carline companies for tax year 1990. The board rendered its decision prior to the release of *Natural Gas Pipeline Co.* and, therefore, denied the requests, based upon L.B. 1 and L.B. 7. The companies appealed, arguing that both statutes were unconstitutional and, thus, any taxation of their personal property would violate the uniformity clause of the Nebraska Constitution and the Equal Protection Clause of the U.S. Constitution.

Having struck down L.B. 7 in *Natural Gas Pipeline Co.*, the court proceeded to strike down L.B. 1 as well, holding that the Legislature's attempt to "designate as a 'fixture' that which is, in fact and in truth, personal property" exceeded its common-law powers of definition and violated the special legislation provision of article III, § 18. *MAPCO Ammonia Pipeline*, 238 Neb. at 573, 471 N.W.2d at 740. With both L.B. 1 and L.B. 7 rendered ineffectual, the court noted that the plaintiffs were left in essentially the same position as the parties in *Northern Natural Gas Co., supra*, and *Natural Gas Pipeline Co., supra*. However, rather than simply following those cases and reversing and remanding for "equalization" of the plaintiffs' personal property with that of the railroads, the

court revisited the question of whether "equalization" was an appropriate remedy under the circumstances.

In *Northern Natural Gas Co.* and *Natural Gas Pipeline Co.*, the court held that the uniformity and equal protection clauses required the board to equalize the valuation of the plaintiffs' pipelines with that of railroad rolling stock left untaxed due to the decision in *Trailer Train Co.* In *MAPCO Ammonia Pipeline*, the court recognized that railroad rolling stock, agricultural income-producing machinery and equipment, and other personal property not taxed due to either legislative action or judicial decision is not assessed at "zero percent" of value for tax purposes. Rather, such property is simply not assessed at all because it is not taxed. Therefore, because

> "[t]he purpose of equalization of assessments is to bring the *assessment* of different parts of a taxing district to the same relative standard, so that no one of the parts may be compelled to pay a disproportionate part of the tax." . . . The process of equalization . . . cannot be applied to property that is not taxed.

(Emphasis supplied.) *MAPCO Ammonia Pipeline*, 238 Neb. at 577, 471 N.W.2d at 742, quoting *Natural Gas Pipeline Co., supra*. Accordingly, the court expressly disapproved any language in *Northern Natural Gas Co.* implying that "equalization" is an appropriate remedy in these cases.

Faced with the same discriminatory tax structure at issue in *Northern Natural Gas Co.* and *Natural Gas Pipeline Co.*, but no remedy, the *MAPCO Ammonia Pipeline* court embarked on a significantly different approach to the personal property tax dilemma. The court recognized that if the Legislature's system of exemptions *prevents* the uniformity required by the Constitution, the exemptions themselves are unconstitutional, and thus the exempt property must be returned to the tax rolls. This approach essentially transformed *MAPCO Ammonia Pipeline* from a case involving a claim for "equalization" to a declaratory judgment action regarding the constitutionality of the exemptions contained in § 77-202(6) through (9).

In overruling *Stahmer* and holding the exemptions contained in § 77-202(6) through (9) unconstitutional, the court relied upon both components of the uniformity clause analysis set out

above. With regard to the first prong of the test, the court distinguished *Stahmer*, noting that "enforcement of [the 4-R Act] by the federal court's enjoining the collection of taxes, and similar relief granted by this court pursuant to Neb. Const. art. VIII, § 1, has had the effect of making Nebraska's system of taxation increasingly discriminatory as to the remaining taxpayers." *MAPCO Ammonia Pipeline*, 238 Neb. at 582, 471 N.W.2d at 745. This passage reflects the court's recognition of the fundamental changes in the property tax distribution which occurred between 1972 and 1991. Specifically, the removal of large amounts of income-producing personal property from the tax rolls due to a confluence of legislative and judicial action, combined with the Legislature's refusal after 1980 to "fill" these "hole[s]" by reimbursing the counties with moneys derived from other sources, resulted in an unfair shift of the tax burden to the remaining taxpayers. See Revenue Committee Hearing, L.B. 299 and 829, 92d Leg., 1st Sess. 3-5 (March 20, 1991).

As to the second prong of the test, the court noted that, as in *Northern Natural Gas Co.* and *Natural Gas Pipeline Co.*, the plaintiffs were "entitled to the same tax treatment as the railroads, carline companies, and other centrally assessed taxpayers pursuant to Neb. Const. art. VIII, § 1." *MAPCO Ammonia Pipeline*, 238 Neb. at 577, 471 N.W.2d at 742. In previous cases the court achieved this equality of treatment by prohibiting the inclusion of pipelines in the board's "unit value" determinations. In *MAPCO Ammonia Pipeline*, however, the court reasoned that operation of the 4-R Act prevented the State from uniformly taxing income-producing personal property owned by railroads and carline companies at the same rate as that owned by pipeline companies. The court further recognized that by failing to repeal the discriminatory exemptions after *Trailer Train Co.*, the Legislature in effect decided to perpetuate the favorable treatment of the railroads and carline companies. In this sense *MAPCO Ammonia Pipeline* is simply a reprise of the decision in *Natural Gas Pipeline Co.*, with the court again holding that there is no substantial difference in situation or circumstance justifying favorable treatment of income-producing personal property

owned by the railroads and carline companies, but not similar property owned by pipeline companies and other centrally assessed entities.

Because the 4-R Act did not exist at the time *Stahmer* was decided, no questions of federal law were involved in that decision. In *MAPCO Ammonia Pipeline*, the court held that subsequent to passage of the 4-R Act in 1979, the equality of treatment mandated by the uniformity and equal protection clauses of the Nebraska Constitution became impossible and thus rendered obsolete the reasoning in *Stahmer*. In so doing, the court balanced the authority granted in the "classification" clause against the constraints imposed by the uniformity clause based upon consideration of the two factors discussed above. We similarly rely upon a consideration of these two factors in analyzing the constitutionality of § 7 of L.B. 829.

### (e) Analysis of L.B. 829

A statute is presumed to be constitutional, and all reasonable doubts will be resolved in favor of its constitutionality. *State ex rel. Spire v. Strawberries, Inc.*, 239 Neb. 1, 473 N.W.2d 428 (1991); *In re Application A-16642*, 236 Neb. 671, 463 N.W.2d 591 (1990). The burden is upon the party claiming a statute is unconstitutional to establish its unconstitutionality. *Id.*

Here, the State argues that § 7 of L.B. 829 is constitutionally valid because elimination of the personal property tax is "eminently reasonable." Brief for defendants at 32. Specifically, the State points to the administrative difficulties associated with collection of a tax on personal property— difficulties resulting in its oft-repeated characterization as a "liar's tax." The State also argues that the exemption is a legitimate economic development measure designed to prevent the loss of certain inventory-intensive industries to neighboring states which do not tax personal property. As we made clear in *Bann County v. State Bd. of Equal.*, 226 Neb. 236, 411 N.W.2d 35 (1987), however, the reasonableness of a classification will not save a legislative enactment violative of the uniformity clause. Therefore, it is first necessary to determine whether § 7 of L.B. 829 improperly shifts the property tax burden to the remaining taxpayers.

When the Legislature initiated the current system of exemptions in 1972, it "fully funded" them with revenues derived from the sales tax and the income tax. The scheme did not shift any of the property tax burden to the remaining taxpayers, and thus the only issue confronting the *Stahmer* court was the reasonableness of the classifications drawn. As noted earlier, however, subsequent events resulted in a dramatic shift in the property tax burden. In *MAPCO Ammonia Pipeline*, this court held that the burden on the remaining taxpayers was too great and declared the exemptions contained in § 77-202(6) through (9) unconstitutional.

For tax year 1991, § 7 of L.B. 829 essentially codifies the situation as it stood prior to *MAPCO Ammonia Pipeline*, with the additional exemption of the small sliver of personal property remaining on the tax rolls at that time. The State focuses on this small sliver of personal property in attempting to distinguish *MAPCO Ammonia Pipeline* and persuade us that § 7 is valid. According to the State, *MAPCO Ammonia Pipeline* turns on the constitutional repugnancy of exempting approximately 75 percent of the state's income-producing personal property, while taxing the remaining 25 percent. In support of this interpretation, the State relies upon language from a concurrence in *Natural Gas Pipeline Co.* questioning the exemption of "all but a small amount of property." *Natural Gas Pipeline Co.*, 237 Neb. at 375, 466 N.W.2d at 472 (White and Fahrnbruch, JJ., concurring). In this case, the State points out, the situation is "effectively reversed" because real property constitutes approximately 75 percent of the property tax base and personal property only 25 percent. Thus, the State concludes that § 7 is valid because it "retains the taxation of tangible property as to nearly three-fourths of property available for taxation." Brief for defendants at 39.

The State's reading of *MAPCO Ammonia Pipeline* is overly narrow. The concurring opinion in *Natural Gas Pipeline Co.* relied upon by the State makes clear that the concern with the shifting property tax burden extends to owners of real property. This concurrence concludes by noting that

> the boards of equalization cannot exercise their duty of valuing uniformly if the federally protected property and

exempt property are not taxed and nonprotected and nonexempt property is valued and taxed.

The decision in [*Trailer Train Co.*] has sounded the death knell for personal property taxation in this state unless the preferential treatment to certain classes of personal property is abandoned. *Taxation of real estate may also be at risk for the same reasons.*

(Emphasis supplied.) *Natural Gas Pipeline Co.*, 237 Neb. at 376, 466 N.W.2d at 473. Similarly, *MAPCO Ammonia Pipeline* overruled *Stahmer* because subsequent developments "had the effect of making Nebraska's system of taxation increasingly discriminatory as to *the remaining taxpayers.*" (Emphasis supplied.) *MAPCO Ammonia Pipeline*, 238 Neb. at 582, 471 N.W.2d at 745. It is clear that in *MAPCO Ammonia Pipeline*, this court adopted the reasoning of the concurring opinion in *Natural Gas Pipeline Co.*

The avowed purpose of the uniformity clause was to prevent special interests from achieving tax exemptions and thereby "unload the taxation of property onto the other class." 2 Proc. Const. Convention at 2371. Between 1972 and 1991, real property increased from 78 percent to 92 percent of the property tax base due to the large proportion of personal property taken off the tax rolls. We perceive no reason why it is less unfair to shift the property tax burden to owners of real property than to owners of income-producing personal property and, therefore, reject the narrow interpretation of *MAPCO Ammonia Pipeline* advanced by the State.

We note that § 26 of L.B. 829 provides for the reimbursement of the State's political subdivisions for any revenues lost due to "the exemption from taxation of personal property which was immediately prior to [June 11, 1991], subject to tax for tax year 1991 but which is exempt from tax solely because of the changes made to section 77-202 by [L.B. 829]." 1991 Neb. Laws, L.B. 829, § 26 (codified at Neb. Rev. Stat. § 77-27,138.01 (Supp. 1991)). The only personal property subject to taxation "immediately prior to [June 11, 1991]" was the small sliver of income-producing personal property not already legislatively or judicially "exempted" at the time of the decision in *MAPCO Ammonia Pipeline*. Thus, as regards the

property tax burden on real property owners, § 26 of L.B. 829 merely retains the status quo as it existed at that time. In other words, the plight of the state's landowners for tax year 1991 does not get any worse with passage of L.B. 829, but it does not get any better either.

In *MAPCO Ammonia Pipeline,* we concluded that the Legislature's system of exemptions placed an unconstitutionally heavy burden on owners of property remaining on the tax rolls, which included real property owners. As it relates to tax year 1991, § 7 of L.B. 829 imposes an identical burden. Therefore, we hereby declare § 7 of L.B. 829, as it relates to tax year 1991, unconstitutional as a violation of the uniformity clause of Neb. Const. art. VIII, § 1.

### 2. TAX YEAR 1992

The plaintiff also challenges § 7 of L.B. 829 as it relates to tax year 1992 and subsequent tax years. The provision in § 7 exempting all personal property except automobiles from the tax rolls applies only to tax year 1991. Thereafter, the bill essentially recodifies the schedule of exemptions as they existed at the time of the *MAPCO Ammonia Pipeline* decision. The plaintiff argues that not only are the exemptions which this court struck down in *MAPCO Ammonia Pipeline* still invalid, but the remainder of the statute is invalid as well. See § 77-202(1) through (11). It is unnecessary to address this issue, however, because subsequent events have rendered the question moot.

Existence of an actual case or controversy is a prerequisite to the exercise of judicial power in Nebraska. *Mullendore v. Nuernberger,* 230 Neb. 921, 434 N.W.2d 511 (1989) (*Mullendore I*). The case or controversy requirement "applies with equal, if not stronger, force to an action for a declaratory judgment, since the right to maintain the action is expressly granted only to those 'person[s] . . . whose rights, status or other legal relations are affected by a statute.' " *Id.* at 926, 434 N.W.2d at 515, quoting Neb. Rev. Stat. § 25-21,150 (Reissue 1989). The doctrine of mootness is a key component in determining whether an actual case or controversy exists. *Mullendore I.*

On March 18, 1992, the Governor signed 1992 Neb. Laws, L.B. 1063, into law. The bill contained an emergency clause so that its provisions became effective the following day. 1992 Neb. Laws, L.B. 1063, § 215. See Neb. Const. art. III, § 27; *Wilson & Co. v. Otoe County*, 140 Neb. 518, 300 N.W. 415 (1941) (a statute passed with an emergency clause goes into effect the day following its approval by the Governor). L.B. 1063 provides for the repeal of § 77-202 as of January 1, 1992. 1992 Neb. Laws, L.B. 1063, §§ 213 and 210.

For 1991, persons required to list property with the county assessor for property tax purposes were required to do so by March 1, 1991. See Neb. Rev. Stat. § 77-1229 (Reissue 1990). Property taxes for that year were required to be levied by, and became a lien on, November 1, 1991. See Neb. Rev. Stat. §§ 77-1601, 77-1613, 77-1616, and 77-205 (Reissue 1990). Thus, tax year 1991 was completed on November 1, 1991. See *Natural Gas Pipeline Co., supra*. The provisions of § 7 of L.B. 829 were still in effect when the plaintiff's 1991 taxes were levied, and therefore his challenge as regards that year presents a justiciable controversy. See *Mullendore v. School Dist. No. 1*, 223 Neb. 28, 388 N.W.2d 93 (1986) (repeal of tax statute did not moot constitutional challenge where taxpayer may have already paid taxes under the statute and a declaration of unconstitutionality would entitle him to a refund).

Taxpayer personal property lists for 1992 were not due in the assessor's office until June 1, 1992. 1992 Neb. Laws, L.B. 1063, § 98. From that date, the county boards have until September 20 to levy the 1992 property taxes. *Id.* at § 130. Because the exemptions contained in § 7 of L.B. 829 were repealed as of January 1, 1992, they do not affect the calculation of property taxes for tax year 1992 or any year thereafter. Therefore, the plaintiff's assertion that § 7 of L.B. 829 is unconstitutional as it relates to tax years subsequent to 1991 is now moot. See *Mullendore I* (repeal of statute establishing tax levy corresponding to nonresident high school tuition rates and relator's failure to prove any adverse impact occurring while the statute was in effect mooted constitutional challenge to the statute).

## II. SECTION 5

The plaintiff next argues that L.B. 829 is unconstitutional because § 5 of the act, which defines "real property" to include "mobile homes," results in an impermissible commutation of a tax. See Neb. Const. art. VIII, § 4.

Having struck down § 7 of L.B. 829 as it relates to the 1991 tax year, we note the general rule that when part of an act is held unconstitutional the remainder must likewise fail, unless the unconstitutional portion is severable from the remaining portions. *Fitzgerald v. Kuppinger*, 163 Neb. 286, 79 N.W.2d 547 (1956). This court has identified several factors for consideration in determining whether an unconstitutional provision is severable from the remainder of a statute: (1) whether, absent the invalid portion, a workable plan remains; (2) whether the valid portions are independently enforceable; (3) whether the invalid portion was such an inducement to the valid parts that the valid parts would not have passed without the invalid part; (4) whether severance will do violence to the intent of the Legislature; and (5) whether a declaration of separability indicating that the Legislature would have enacted the bill absent the invalid portion is included in the act. *State ex rel. Spire v. Strawberries Inc.*, 239 Neb. 1, 473 N.W.2d 428 (1991).

Based upon a consideration of these factors, we conclude that § 7 is severable from § 5 of L.B. 829. First, L.B. 829 includes a provision expressly stating that a declaration of unconstitutionality as to any section does not affect the validity of the remaining sections. 1991 Neb. Laws, L.B. 829, § 35. Second, we note that in repealing the exemptions contained in § 7, the Legislature retained the definition of real property contained in § 5. See 1992 Neb. Laws, L.B. 1063, § 44 (codified at Neb. Rev. Stat. § 77-103 (Supp. 1991)). From this it is clear that § 5 is independently enforceable and that a workable plan remains. Lastly, our review of the legislative history surrounding passage of L.B. 829 reveals nothing to indicate that § 5 would not have passed in the absence of § 7 or that severance of the two provisions would do violence to the intent of the Legislature.

Proceeding to the plaintiff's argument regarding § 5, it is

noteworthy that he challenges the provision *only* on the basis that it constitutes a commutation of a tax. Cf. *Natural Gas Pipeline Co., supra* (redefinition of term "real property" to include pipelines exceeded Legislature's common-law power of definition and violated the special legislation provision of the state Constitution). We therefore restrict our analysis to consideration of that issue.

The constitutional proscription against commuting a tax prevents the Legislature from releasing either persons or property from contributing a proportionate share of the tax. *State ex rel. Meyer v. Story*, 173 Neb. 741, 114 N.W.2d 769 (1962). In *Natural Gas Pipeline Co., supra*, this court noted that by virtue of this constitutional proscription, " 'the legislature is prohibited . . . from changing the method of payment of any tax *once levied*. . . .' " (Emphasis supplied.) *Natural Gas Pipeline Co.*, 237 Neb. at 368, 466 N.W.2d at 469, quoting *Steinacher v. Swanson*, 131 Neb. 439, 268 N.W. 317 (1936). *Natural Gas Pipeline Co.* involved a statute redefining the term "real property" to include pipelines. See 1989 Neb. Laws (1st Spec. Sess.), L.B. 1, § 1. The statute was passed by the Legislature on November 17, 1989, with an emergency clause and was signed into law by the Governor on November 21, 1989. Noting that "[t]he power to tax is exercised when the tax is levied" and that the tax year with respect to property taxes ended on November 1, 1989, the court held that application of the statute to the 1989 tax year would result in an impermissible commutation of a tax. *Natural Gas Pipeline Co.*, 237 Neb. at 367, 466 N.W.2d at 468.

*Natural Gas Pipeline Co.* is clearly distinguishable from the case at hand. L.B. 829 was signed into law by the Governor on June 10, 1991, with the effective date of § 5 retroactive to January 1, 1991. 1991 Neb. Laws, L.B. 829, § 34. As noted previously, county boards have until September 15 to levy taxes for all political subdivisions and the county officers responsible for preparing the tax lists until November 1 to extend the 1991 levies for all property. See §§ 77-1601 and 77-1613. Whereas in *Natural Gas Pipeline Co.* the levy was completed and the taxing power exercised 20 days *prior* to enactment of the statute, here personal property taxes for 1991 would not be levied until

several months *after* enactment of the statute. Thus, the plaintiff's contention that § 5 results in the commutation of a tax is without merit.

### III. MULTIPLE SUBJECTS IN ONE ACT

The plaintiff also argues that L.B. 829 is unconstitutional because it contains more than one subject, in violation of article III, § 14, of the Nebraska Constitution. The plaintiff points out that the act includes provisions relating to property taxes, which exist as a revenue source for political subdivisions only, as well as provisions regarding the sales and use tax and the corporate income tax, which exist as revenue sources for the State. See 1991 Neb. Laws, L.B. 829, §§ 7, 21, 22, and 24. The plaintiff also notes the inclusion of provisions governing such diverse topics as the procedure for obtaining a tax refund and the retroactive application of judicial decisions declaring a tax or penalty unconstitutional. *Id*. at §§ 13, 14, and 15.

A statute does not violate article III, § 14, if it can fairly be said that the title calls attention to the subject matter of the bill. *Blackledge v. Richards*, 194 Neb. 188, 231 N.W.2d 319 (1975). In *Anderson v. Tiemann*, 182 Neb. 393, 155 N.W.2d 322 (1967), *appeal dismissed* 390 U.S. 714, 88 S. Ct. 1418, 20 L. Ed. 2d 254 (1968), the plaintiffs challenged a bill providing for a sales tax, a use tax, an income tax, and a franchise tax as violating the constitutional prohibition against including more than one subject in a single bill. In rejecting the plaintiffs' claim, the court stated:

> If an act has but one general object, no matter how broad that object may be, and contains no matter not germane thereto, and the title fairly expresses the subject of the bill, it does not violate Article III, section 14, of the Constitution. [Citation omitted.]
>
> . . . This court holds that the provisions of [the challenged statute] contain but one general subject, taxation, and that it does not violate the Constitution of Nebraska.

*Id*. at 408-09, 155 N.W.2d at 332.

The title of L.B. 829 discloses that it relates to taxation and revenue. All of the provisions in the bill relate and are germane

to the general subject of taxation. *Blackledge* and *Anderson* make clear that this is enough. We cannot say the bill violates article III, § 14, of the Nebraska Constitution.

Finally, in connection with his argument that L.B. 829 contains more than one subject, the plaintiff argues that § 14 of the act violates the doctrine of separation of powers contained in Neb. Const. art. II, § 1. Section 14 vests the Tax Commissioner with authority to determine whether judicial decisions holding a tax or penalty unconstitutional should apply prospectively, subject only to review by the court rendering the decision in the same manner as a motion for rehearing. 1991 Neb. Laws, L.B. 829, § 14 (codified at Neb. Rev. Stat. § 77-1736.04 (Supp. 1991)). The provision further vests exclusive jurisdiction in the Supreme Court to determine the constitutionality of tax laws of statewide application. *Id*.

The Nebraska Constitution firmly establishes that the judicial power in Nebraska is vested solely in the courts. *Transport Workers of America v. Transit Auth. of City of Omaha*, 205 Neb. 26, 286 N.W.2d 102 (1979), citing Neb. Const. art. II, § 1, and art. V, § 1.

> As a general rule administrative agencies have no general judicial powers, notwithstanding they may perform some quasi-judicial duties. Moreover, unless permitted by the Constitution, the Legislature may not authorize administrative officers or bodies to exercise powers which are essentially judicial in their nature, or to interfere with the exercise of such powers by the courts.

*Transport Workers of America*, 205 Neb. at 34, 286 N.W.2d at 107. In *Transport Workers of America*, the court held that the entry of declaratory judgments and the ordering of accountings are clearly judicial functions which the Legislature may not delegate to the Commission of Industrial Relations.

*Davis v. General Motors Acceptance Corp.*, 176 Neb. 865, 127 N.W.2d 907 (1964), involved a series of statutes passed by the Legislature relating to installment sales contracts and installment loans. One of these statutes included a provision that any declaration of unconstitutionality as to the statutes would apply prospectively only. This court held that the provision violated the doctrine of separation of powers. The

court reasoned:

> It is a settled principle of constitutional law that the construction and interpretation of the Constitution is a judicial function and it is the duty of the judicial branch of our government to determine whether an act of the Legislature contravenes the provisions of the Constitution. [Citation omitted.] This power and duty necessarily include the authority to determine what effect if any an unconstitutional statute shall have upon the rights of parties which may have been affected by it.

*Id.* at 871, 127 N.W.2d at 912.

The State seeks to avoid the effect of *Davis* by noting that L.B. 829 provides for judicial review of the Tax Commissioner's determination in the same manner as a motion for rehearing. Cf. *Anderson v. Tiemann, supra* (delegation of quasi-judicial functions to the Tax Commissioner is allowable when the duties relate to matters peculiarly within the public interest and provision is made for appeal to the courts). *Anderson*, however, involved only a challenge to the general rulemaking authority of the Tax Commissioner. *Davis* makes clear that determination of the prospective or retroactive effect of a judgment of unconstitutionality is essentially judicial in nature, as opposed to merely a quasi-judicial function, and therefore may not be delegated to an administrative agency.

For the same reasons discussed above in relation to § 5 of L.B. 829, we find that § 14 is severable from the remainder of the act. Therefore, in addition to declaring § 7 of L.B. 829 unconstitutional as it relates to tax year 1991, we also declare § 14 of L.B. 829 unconstitutional as a violation of the separation of powers doctrine contained in Neb. Const. art. II, § 1.

JUDGMENT FOR PLAINTIFF.

SHANAHAN, J., dissenting.

With a boost from today's decision, taxes of many Nebraskans are going up. Meanwhile, referring to its previous and fundamentally erroneous opinions, the majority whistles as it walks by a tax statute graveyard nearly filled to capacity with tax legislation garroted by this court's decisions that fail or refuse to recognize the Legislature's constitutional authority to

set tax policy for the State of Nebraska.

## DEFECTIVE CONSTRUCTION

As a preamble for its discussion about 1991 Neb. Laws, L.B. 829, the majority mentions generally accepted rules for construction of the Nebraska Constitution:

> A state constitution is the supreme written will of the people of a state [and], as amended, must be read as a whole. . . . A constitutional amendment becomes an integral part of the instrument and must be construed and harmonized, if possible, with all other provisions so as to give effect to every section and clause as well as to the whole instrument. . . . If inconsistent, a constitutional amendment prevails over a provision in the original instrument; but a court will find distinct constitutional provisions repugnant to each other only when they relate to the same subject, are adopted for the same purpose, and are incapable of enforcement without substantial conflict.

However, in the majority's usage, the Nebraska Constitution, the "supreme written will of the people," becomes a vehicle for judicial expression of tax policy. An amended constitution, required to be read "as a whole" or single document with harmonized parts, becomes a black hole that results from this court's tax decisions which have caused the collapse of constitutional power expressly conferred on the Legislature to classify and exempt tangible personal property for tax purposes. Regarding the principle that a "constitutional amendment prevails over a provision in the original" constitution, that rule of construction, after the majority's lip service, sails into a constitutional sunset and apparently falls off the edge of the Earth, for preeminence of a constitutional amendment is never seen or heard again in the majority's opinion.

## THE 1919-1920 CONSTITUTIONAL CONVENTION

Rather than basing its decision on the content of the Nebraska Constitution, the majority refers to comments and cryptic "concerns" at the 1919-1920 constitutional convention, at which the uniformity clause was placed in this state's

Constitution some 72 years ago. Bear in mind that Nebraska's electorate in 1970 adopted the constitutional amendment which expressly confers on the Legislature the power to enact laws exempting tangible property from taxation and classify personal property "as it sees fit," to the end that the Legislature "may exempt any of such classes, or may exempt all personal property from taxation." Neb. Const. art. VIII, § 2. Thus, the majority operates from a premise that the 1919-1920 constitutional conventioneers enjoyed the gift of prophecy and, envisioning the 1970 constitutional amendment for tax exemption for property, elevated the uniformity clause to its zenith in a hierarchy of constitutional provisions pertaining to property taxation. Thus, foreseeing the future, those conventioneers chiseled into constitutional granite the monolithic uniformity clause, impervious to any later amendatory action by the people of Nebraska. So long as the majority is captivated by William Jennings Bryan, consider some of his other remarks at the 1919-1920 convention:

> Ours is a people's government . . . . The people will, if they have the power, destroy the breeding places of plutocracy. The initiative and referendum give them this power. They put the people in possession of their government and make it possible for them to secure *through the ballot* anything and everything they want.

(Emphasis in original.) 1 Proc. Const. Convention 327 (1919-1920). In light of the foregoing, imagine Bryan's reverence for a constitutional amendment adopted by the people. By the way, records of the 1919-1920 constitutional convention show that Bryan was not even a delegate to the convention, and, after lecturing to the assembly and preparing to depart for Washington, D.C., to celebrate adoption of the 18th Amendment to the U.S. Constitution, imposing nationwide prohibition, Bryan informed the conventioneers: "[T]here will never be another legalized saloon in the United States." Obviously, Bryan did not share in the gift of prophecy that the majority attributes to the constitutional conventioneers, for the will of the people, expressed in the 21st Amendment adopted in 1933, repealed the 18th Amendment. The established lack of credibility for Bryan's augury is no less

than the lack of credibility for the constitutional conventioneers' precognition of the 1970 amendment for tax classification and exemption of tangible property, when the uniformity clause was made a part of the Nebraska Constitution in 1920. The only salient fact is that the "will of the people" should never be underestimated or overlooked by a court construing a constitution.

## A NOVEL FISCAL IMPACT TEST
## FOR CONSTITUTIONALITY

At this point, it is instructive to consider the plain language of the Nebraska Constitution and the statutory provision which this court declares unconstitutional today. The uniformity clause, Neb. Const. art. VIII, § 1, adopted by the 1919-1920 constitutional convention, provides that "[t]axes shall be levied by valuation uniformly and proportionately upon all tangible property and franchises, except that the Legislature may provide for a different method of taxing motor vehicles . . . ." The classification clause, Neb. Const. art. VIII, § 2, adopted by popular vote in 1970, provides in pertinent part that "[t]he Legislature may classify personal property in such manner as it sees fit, and may exempt any of such classes, or may exempt all personal property from taxation." L.B. 829, § 7(12), which the court condemns as a violation of the foregoing constitutional provisions, states that "[f]or tax year 1991, all personal property . . . other than motor vehicles . . . shall be exempt from property taxation."

Given the principles of constitutional construction previously mentioned, and the fact that the Legislature enacted a statute precisely in accord with the authority expressly granted by the constitutional amendment embodied in article VIII, § 2, no prolonged examination of L.B. 829's constitutionality should have been necessary.

Instead of applying those accepted principles for construing a constitution, the majority delves into the tax axiom: maintaining or increasing a particular level of tax revenue, while granting exemptions from taxation, necessitates an increase of taxation on the remaining objects of taxation. Resorting to that axiom, the majority declares that "because

the grant of exemptions to one group necessarily entails raising the taxes of another disfavored group," the uniformity clause focuses on the "*effect* of [property tax exemption] classifications on the remaining tax base." (Emphasis in original.) Thus, according to the majority, the purpose of the uniformity clause is prevention of new property tax exemptions that increase the tax burden borne by owners of property remaining subject to taxation. At that point, and without any suggestion by the parties, the majority conjures up its fiscal impact theory of "fully funded" tax exemptions and creates a constitutionally estranged and peculiarly novel test to determine validity of a tax exemption statute. "Creates" is the appropriate term in reference to the majority's new test, for the Nebraska Constitution contains nothing textually or by implication that serves as a basis for the majority's test announced today. As used by the majority, "fully funded" means that for constitutional validity, tax exemptions must be accompanied by a corresponding and contemporaneous tax measure to assure full compensation or restitution for tax revenue lost through the exemptions. Hence, the majority today reveals a test that requires a court to consider "(1) whether the exemptions improperly shift the property tax burden to the remaining tax base, and (2) whether there is a substantial difference of situation or circumstance justifying differing legislation for the objects classified." Consequently, the majority concludes that any exemption which is not "fully funded" results in an "unfair shift of the tax burden to the remaining taxpayers," violates the uniformity clause, and, therefore, is unconstitutional. For this court's majority, then, "unfair" is equated with "unconstitutional," terms that are used interchangeably and synonymously in determining constitutionality of a tax statute.

In some rather slipshod sophistry as an attempt to explain "fully funded," and as a veil over the void in its position, the majority diverts attention to the sales and income tax programs enacted before the 1970 constitutional amendment that authorized exemption of property from taxation. Even to an alien in the world of taxation, sales and income taxes are different from and essentially unrelated to ad valorem taxation

of tangible property. Nevertheless, revenues from sales and income taxes, the majority says, softened the impact on political subdivisions that suffered a loss of tax revenue, taxes that would have been collected if there were no exemptions from property taxation as a result of the exemptive legislation in 1972. When distribution of sales and income taxes to political subdivisions was subsequently discontinued by the State in 1980, but local budgets retained demands for the lost revenue, taxing authorities turned their eyes to taxable tangible property and increased property taxes to offset or compensate for the loss of sales and income tax revenue. That ensuing increase of property taxes, the majority asserts, makes the exemptions authorized by the 1970 constitutional amendment "unfair" and, therefore, "unconstitutional." Yet, the majority fails to explain how changes in sales and income tax laws are inextricably and constitutionally interwoven with property tax exemptions which, according to the majority's new test, must be evaluated on the basis of an exemption's relationship to and immediate direct effect on the burden imposed on taxable property. In short, by dragging the sales and income tax program into the picture, the majority subverts and flunks its own novel test revealed today.

Furthermore, the majority announces that property tax exemptions which are not fully funded are unconstitutional because those exemptions unfairly shift an additional property tax burden to the remaining taxable property. What has escaped the majority's attention is the fact that L.B. 829 follows the majority's fully funded requirement exactly. In § 7 of L.B. 829, the Legislature exempted all personal property from taxation in 1991, but at the same time, in § 20 of L.B. 829, replaced all lost tax revenues by imposing a 2 percent surcharge on depreciation claimed by a taxpayer property owner as a deduction for determining income subject to federal taxation under the Internal Revenue Code of 1986. Of course, that depreciation surcharge, as a source of tax revenue, has been today struck down and eliminated as inseparable from the exemptive provisions at issue in this case. See *Bahensky v. State, post* p. 147, 486 N.W.2d 883 (1992). This leaves the court in the remarkably illogical position of striking down property tax

exemptions in L.B. 829 because the exemptions have not been fully funded by a provision for replacement of lost tax revenue, and then striking down the replacement funding provision in L.B. 829 because there are no longer any exemptions that require funding to replace lost tax revenues.

Beyond question, a lack of confidence and the absence of a constitutional foundation for its new test have prompted the majority to rewrite several of its recent tax decisions concerning the uniformity clause in relation to the legislative power of classification and exemption for tax purposes. Before today, this court has not suggested, or even remotely indicated, that the uniformity clause permits ununiform or variable taxation so long as an exemption is fully funded, or so long as an increased tax burden is not shifted to remaining taxable property. The majority dismisses the actual language of previous tax decisions and instead misreads between the lines for obscure "indicat[ions]," "implications," "concerns," and even "implicit . . . concerns." For instance, in *MAPCO Ammonia Pipeline v. State Bd. of Equal.*, 238 Neb. 565, 471 N.W.2d 734 (1991), this court never concluded or laid judicial groundwork for striking down exemptions because their "burden on the remaining taxpayers was too great." Whatever else today's majority may attribute to *MAPCO Ammonia Pipeline*, the fact remains that the *MAPCO Ammonia Pipeline* majority struck down certain exemptions believed to result in ununiform taxation contrary to the classification clause in article VIII, § 2, and contrary to preemptive federal law that eventually affected Nebraska's tax structure. Thus, the majority rewrites *MAPCO Ammonia Pipeline* in an abortive attempt to fashion some precedent for its novel and constitutionally indefensible approach to a test for validity of exemptions from property taxation. However, rewriting previous decisions, compared with rewriting the Constitution, is a feat of rather small import.

As one additional observation at this point, the majority, elevating the uniformity clause to a position of constitutional preeminence in property taxation, has characterized the uniformity clause as a measure "to prevent a plethora of special-interest-driven exemptions from the tax on tangible

property." Ironically, L.B. 829, exempting all tangible property from taxation, was not the product of concerted effort by special interest groups, but was necessitated by this court's constitutionally unwarranted unwillingness to recognize the Legislature's power to classify property and exempt property from taxation.

Ultimately and unfortunately, the majority offers an illusory explanation in striking down L.B. 829, definitely disregards the Legislature's explicit constitutional power to "exempt all personal property from taxation," and declares L.B. 829 unconstitutional because the Legislature "improperly shift[s] the property tax burden to the remaining tax base." The burden of taxation, as an incident of the power to tax, is a political matter for consideration and determination by the Legislature, not by this court.

As Aldous Huxley noted: "Facts do not cease to exist because they are ignored." While this court ignores the Legislature's constitutional power to classify and exempt property for tax purposes, this does not mean that the people of Nebraska have not conferred those powers on their Legislature.

## EQUAL PROTECTION

Steeped in its perception of tax "fairness," the majority seeks refuge in the "principles of equal protection." Indeed, this court has specifically held that the analysis required under the uniformity clause comes from the Equal Protection Clause of the 14th Amendment to the U.S. Constitution. See *State ex rel. Douglas v. State Board of Equalization and Assm't*, 205 Neb. 130, 286 N.W.2d 729 (1979).

Although there is no equal protection clause in the Nebraska Constitution, this court has often noted that the special legislation clause of article III, § 18, is the equivalent of the Equal Protection Clause of the 14th Amendment to the U.S. Constitution in reference to disparate treatment. See, *Porter v. Jensen*, 223 Neb. 438, 390 N.W.2d 511 (1986); *Farm Bureau Life Ins. Co. v. Luebbe*, 218 Neb. 694, 358 N.W.2d 754 (1984). Also, this court has directly tied its analysis of article III, § 18, to the U.S. Supreme Court's analysis of the 14th Amendment's Equal Protection Clause. See *Willis v. City of Lincoln*, 232

Neb. 533, 441 N.W.2d 846 (1989). This accounts for the attempt by some members of this court to use the 14th Amendment's Equal Protection Clause as a reason for striking down property tax classifications and exemptions in earlier property tax cases. See *Natural Gas Pipeline Co. v. State Bd. of Equal.*, 237 Neb. 357, 466 N.W.2d 461 (1991) (White and Fahrnbruch, JJ., concurring) (Grant, J., concurring). See, also, *MAPCO Ammonia Pipeline v. State Bd. of Equal.*, 238 Neb. 565, 471 N.W.2d 734 (1991) (Fahrnbruch, J., concurring). The equal protection echoes are heard again in today's decision, when the majority states that "principles of equal protection form much of this court's uniformity clause jurisprudence."

Very recently, in *Nordlinger v. Hahn*, 60 U.S.L.W. 4563 (U.S. June 18, 1992) (No. 90-1912), the U.S. Supreme Court considered a California property tax system that included unequal or disparate real estate taxes on similar pieces of property, depending on the date of acquisition by the property owner. Under the California system, property taxes might vary as much as 1,700 percent, since long-term owners paid lower taxes, reflecting historic property values at the time of acquisition, while newer owners paid higher taxes, reflecting more recent values based on the current real estate market. In upholding the constitutionality of the California tax law challenged under the Equal Protection Clause of the 14th Amendment to the U.S. Constitution, the U.S. Supreme Court expressed the standard for correct consideration of property tax classifications:

> The appropriate standard of review is whether the difference in treatment [between the classes] rationally furthers a legitimate state interest. In general, the Equal Protection Clause is satisfied so long as there is a plausible policy reason for the classification, [citation omitted], the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, [citation omitted], and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational, [citation omitted]. This standard is especially deferential in the context of classifications made by

complex tax laws. "[I]n structuring internal taxation schemes 'the States have large leeway in making classifications and drawing lines which in their judgment produce reasonable systems of taxation.[']" *Williams v. Vermont,* 472 U.S. 14, 22 (1985), quoting *Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 359 (1973). See also *Regan v. Taxation with Representation of Washington,* 461 U.S. 540, 547 (1983) ("Legislatures have especially broad latitude in creating classifications and distinctions in tax statutes").

*Nordlinger,* 60 U.S.L.W. at 4566.

In *Nordlinger,* the Court found at least two rational bases for the California tax program and further noted that "[f]or purposes of rational-basis review, the 'latitude of discretion is notably wide in . . . the granting of partial or total exemptions upon grounds of policy.' " *Id.* at 4567. The *Nordlinger* Court concluded:

Time and again, however, this Court has made clear in the rational-basis context that the "Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted" . . . .

*Id.* at 4568.

Today this court attempts to divert attention from its previously expressed misconception of the U.S. Constitution's Equal Protection Clause related to state taxation. In *Nordlinger,* the U.S. Supreme Court has thoroughly discredited and rejected this court's singular view of equal protection as a basis to repudiate the Legislature's power to classify for tax purposes. Abruptly and quite noticeably backpedaling from equal protection concerns manifested in its earlier tax decisions, the majority now falls back on the comment that equal protection under "the federal Constitution represent[s] only a floor," since obviously the U.S. Supreme Court has pulled the rug from under this court's previous and erroneous equal protection analysis. Nevertheless, the Equal Protection Clause of the 14th Amendment to the U.S.

Constitution, as construed by the U.S. Supreme Court, is the law of the land, even in Nebraska.

What is more curious about today's decision is that after begrudgingly acknowledging that its previous and fallacious equal protection analysis is decimated by *Nordlinger*, the majority, apparently referring to tax classifications and exemptions, alludes to article III, § 18, Nebraska's constitutional prohibition against impermissible classifications. Yet, amendment 1, the constitutional amendment pertaining to tax classifications and exemptions adopted in 1992, contains the language "[n]otwithstanding . . . Article III, § 18 . . . of this Constitution or any other provision of this Constitution to the contrary," which is immediately followed by the expression of legislative authority to classify and exempt tangible property for tax purposes. By specifically mentioning the Nebraska Constitution's prohibition against impermissible classifications, is the majority foretelling a tax Armageddon involving article III, § 18, and amendment 1? More important and disconcerting, is the majority indicating, as surely seems to be the situation, that article III, § 18, will prevail to the chagrin of Nebraska voters who adopted amendment 1? Also, will amendment 1 suffer the same tortured fate that befell the 1970 constitutional amendment for tax classifications and exemptions as the result of today's decision? If so, then this court has unfortunately arrived at the awkward judicial incongruity of creating lawsuits, not resolving them. We shall see; we shall see.

## BACK INTO THE LITIGATION LABYRINTH

As a result of today's decision, some Nebraska property owners will very likely find themselves in considerable tax trouble. According to the majority, the Legislature might constitutionally (1) tax all tangible property, real and personal, in an identical manner; (2) exempt all real and personal property from taxation; or (3) exempt some tangible property from taxation, but from some source replace tax revenue lost through exemptions and thereby prevent increasing the tax burden on remaining property owners. Consequently, under today's decision, the Legislature cannot exempt all personal

property from taxation, while retaining the property tax on real estate; therefore, Nebraska political subdivisions have either collected too much property tax from property owners who have paid an unconstitutional property tax, or not collected enough taxes from property owners who have availed themselves of unconstitutional property tax exemptions. This situation presents two courses of action: (1) honor claims for refunds on all property tax revenues which were unconstitutionally imposed and collected, or (2) collect additional taxes from those who were undertaxed or escaped taxation as the result of unconstitutional exemptions.

The majority's novel test, proclaimed today, is in nowise limited to personal property exemptions. Although the Nebraska Constitution authorizes tax exemptions for property of charitable, religious, and educational organizations, exemptions are not automatic and require enabling legislation to achieve the actual exemption. See *Indian Hills Comm. Ch. v. County Bd. of Equal.*, 226 Neb. 510, 412 N.W.2d 459 (1987) (Nebraska's Constitution does not extend automatic tax exemptions to property of a charitable, religious, or educational organization, but authorizes exemption achieved by legislative implementation). Within the majority's new test is a tax equation: if, as the majority announces, all real and personal property is entitled to equal tax treatment, and tax exemptions that are not fully funded are constitutionally impermissible, then, as a result, all Nebraska's property tax exemptions, existing by legislation and unfunded, are unconstitutional. Consequently, in the absence of constitutionally valid property tax exemptions, all tangible property, whether real estate or personal property and without exception, must be placed on the tax rolls for 1991. The tax equation in today's decision leaves no room for any property tax exemptions, including exemptions for business and agricultural inventories, a private school building, or property previously exempt under Nebraska's Employment and Investment Growth Act, that is, L.B. 775 enacted in 1987 and now codified as Neb. Rev. Stat. § 77-4105 et seq. (Reissue 1990). As a patent paradox springing from its novel test, the majority strikes down the tax exemptions available under L.B.

775, which has generated new employment and an increase in Nebraska's work force, with corresponding increases in revenue from sales and income taxes paid by new employees as consumers and taxpayers. Enabling legislation for the aforementioned illustrative exemptions of tangible property and many other personal property exemptions was contained in § 7 of L.B. 829 pertaining to 1991, legislation which has been struck down by this court. Therefore, as the result of the majority's approach based on absolutely equal tax treatment for real estate and tangible personal property, all tangible property has become taxable for the year 1991. Thus, the potential tax horribles set out in the dissent in *MAPCO Ammonia Pipeline v. State Bd. of Equal.*, 238 Neb. 565, 471 N.W.2d 734 (1991) (Shanahan, J., dissenting), have today become reality in Nebraska.

Perhaps, there may be a question whether and how far the State or its political subdivisions can reach into past tax years to collect additional taxes from taxpayers who have already paid their tax liability under existing statutes. If the State or political subdivisions can reach back and collect additional taxes on property which was, at the time, unconstitutionally exempted from taxation, then Nebraskans owning tax-exempt tangible property may be subject to taxation for all their tangible property previously omitted from taxation. On the other hand, it may be unfair to collect additional taxes from those who, relying on existing tax statutes, were unknowingly undertaxed or untaxed.

If the State's political subdivisions are forced to refund taxes that are unconstitutional as the result of the majority's new test and tax equation, the amount of money at risk absolutely staggers the imagination. According to the majority, an unfair tax burden was shifted to owners of tangible property in 1980, when the State discontinued distribution of sales and income tax revenues to political subdivisions, that is, if local budget and tax revenue requirements remained constant or were increased after termination of the distributions. The inescapable conclusion, based on the majority's test and decision, is that Nebraska's property tax structure has continuously violated the uniformity clause since 1980 and, therefore, has been

continuously unconstitutional since 1980. Assume a 2-year statute of limitations, although in view of today's decision, the statute of limitations for a tax refund is no settled question. In the tax year 1990, Nebraska Department of Revenue figures show that the total of all Nebraska property taxes levied was $1.219 billion. Preliminary figures from the Department of Revenue indicate that the amount may be as high as $1.258 billion for 1991. After today, and with the assumed 2-year statute of limitations, every property tax dollar collected for 1990 and 1991 is potentially subject to refund. A billion here, a billion there, and pretty soon you are talking about a lot of money. The burden of such a cataclysmic tax refund would, paradoxically, fall on all the state's taxpayers through higher property taxes, increases in sales and income taxes, or any other form of additional taxes earmarked as a source of revenue to defray property tax refunds.

## APPLICABLE STATUTE OF LIMITATIONS

Since the majority has effectively concluded that Nebraska's property tax has been unconstitutional since 1980, the ultimate cost of today's decision is closely tied to the applicable statute of limitations. Obviously, more money is at risk the farther back in time that tax overpayments must be refunded or tax underpayments collected. L.B. 829, § 14, specified that any claim for a refund based on unconstitutionality of a property tax must be brought within the tax year of levy or assessment and that refunds might be obtained by only those who successfully contested constitutionality of the tax. However, because the majority has nullified § 14 of L.B. 829, other statutes of limitations may have to be examined regarding time limits for refunds and commencement of tax actions. Which statute or statutes apply is another question left for another day.

## CONCLUSION

After the great public upheaval caused by this court's previous tax decisions, the people of Nebraska adopted amendment 1 in May 1992 and constitutionally separated the uniformity clause from the classification and exemption clause in the Nebraska Constitution relative to taxation of personal property. Amendment 1 is an extensive constitutional

amendment concerning taxation and exemption of personal property, although the amendment does not contain emphatic language by the voters—"and this time we really mean it!" While many might have hoped that amendment 1 would be the last turn in a legal labyrinth of tax turmoil, in reality today's decision marks the entrance into yet another tax maze. As a consequence of the lack of judicial insight and explanation, many crucial questions that should have been answered today remain unanswered as subjects for future lawsuits. Although Benjamin Franklin believed that "in this world nothing is certain but death and taxes," if he were alive in Nebraska today he would likely add "with confusion and litigation." One has to wonder whether the tax policy poltergeists, believed to have been exorcised by amendment 1, may yet haunt this court's tax decisions.